**William Dwaine ELLIOTT, Petitioner,**

v.

**ADMINISTRATOR, ANIMAL AND PLANT HEALTH INSPECTION SERVICE, UNITED STATES DEPARTMENT OF AGRICULTURE; United States of America, Respondents.**

No. 92–1662.

United States Court of Appeals,
Fourth Circuit.

Argued Feb. 2, 1993.

Decided March 30, 1993.

Philip Leroy Whitson, Charlotte, NC, for petitioner.

Leslie Karen Lagomarcino, Office of Gen. Counsel, U.S. Dept. of Agriculture, argued (James Michael Kelly, Associate Gen. Counsel, Raymond W. Fullerton, Asst. Gen. Counsel, Margaret M. Breinholt, Deputy Asst. Gen. Counsel, Office of Gen. Counsel, U.S. Dept. of Agriculture, Washington, DC, on brief), for respondents.

Before HAMILTON and LUTTIG, Circuit Judges, and WARD, Senior United States District Judge for the Middle District of North Carolina, sitting by designation.

## OPINION

HAMILTON, Circuit Judge:

William D. Elliott[1] appeals the decision of the Secretary of the United States Department of Agriculture (Secretary) that he violated § 5(2)(B) (codified at 15 U.S.C. § 1824(2)(B))[2] of the Horse Protection Act.

---

1. The other defendants entered into consent agreements with the Secretary prior to the administrative hearing.

2. 15 U.S.C. § 1824(2) prohibits:

The (A) showing or exhibiting, in any horse show or horse exhibition, of any horse which is sore, (B) entering for the purpose of showing or exhibiting in any horse show or horse exhibition, any horse which is sore, (C) selling, auctioning, or offering for sale, in any

84 Stat. 1404 (1970) (codified as amended at 15 U.S.C. §§ 1821 through 1831) (the Act), by entering on three separate occasions, for purposes of showing, Tennessee Walking Horses (Walkers) which were "sore" within the meaning of the Act.[3]

On the complaint of the Administrator of the Animal and Plant Health Inspection Service (APHIS) of the United States Department of Agriculture (USDA), a hearing was held before an Administrative Law Judge (ALJ). The ALJ found in favor of Elliott on the grounds that the Act did not prohibit a horse from being "sore" at the time the three Walkers were inspected by USDA veterinarians and found to be "sore." The APHIS appealed to the Judicial Officer (JO) of the USDA who reversed the decision of the ALJ and found that Elliott had violated the Act. The decision of the JO thus became the final decision of the Secretary.

Elliott appeals, in part, on the grounds that: (1) the Secretary erred in interpreting the Act, (2) the Act was unconstitutionally vague, and (3) the Secretary improperly relied upon an evidentiary presumption.

We find no reversible error in the decision of the Secretary and, accordingly, his decision is affirmed.

I

On June 16, 1988, Elliott, a trainer of Walkers, paid the fee to enter "Mark's Ebony Ace" in the East Tennessee Walking Horse Classic at Gray, Tennessee. The next day, Elliott presented the horse to the Designated Qualified Person (DQP)[4] for inspection.

Dr. L.W. Critchfield, a USDA veterinarian, testified that he observed the horse during the DQP's inspection and noted that the horse: (1) exhibited pain response to the DQP's palpation of the horse's forelimbs; (2) was standing in a tucked position, with unusual facial expression; and (3) exhibited other body signs of discomfort. Dr. Critchfield then inspected the horse himself, palpating various locations on the horse's front feet and lower legs while observing the horse's reaction. Mark's Ebony Ace exhibited strong pain responses during Dr. Critchfield's examination. Dr. Critchfield's report on the examination states that the horse stood in a manner which indicated it was in pain, and, upon palpation, reflexively tightened its abdominal muscles, strongly tried to move its leg away, shuffled its rear feet forward, reared upward, and then sagged back on its hindquarters. Dr. Critchfield testified at the hearing that such pain responses

---

horse sale or auction, any horse which is sore, and (D) allowing any activity described in clause (A), (B), or (C) respecting a horse which is sore by the owner of such horse.

**3.** In general terms, a horse is sore when it has received deliberate treatment that causes the horse to experience discomfort in its forelimbs when it walks. The purpose of such treatment is to force the horse, because of the discomfort, to simulate the distinctive quick high-step of a properly trained champion Walker. This practice is prohibited by the Act.

More specifically, 15 U.S.C. § 1821 defines "sore" in the following manner:

As used in this chapter unless the context otherwise requires:

(3) The term "sore" when used to describe a horse means that—

(A) an irritating or blistering agent has been applied, internally or externally, by a person to any limb of a horse,

(B) any burn, cut, or laceration has been inflicted by a person on any limb of a horse,

(C) any tack, nail, screw, or chemical agent has been injected by a person into or used by a person on any limb of a horse, or

(D) any other substance or device has been used by a person on any limb of a horse or a person has engaged in a practice involving a horse,

and, as a result of such application, infliction, injection, use, or practice, such horse suffers, or can reasonably be expected to suffer, physical pain or distress, inflammation, or lameness when walking, trotting, or otherwise moving, except that such term does not include such an application, infliction, injection, use, or practice in connection with the therapeutic treatment of a horse by or under the supervision of a person licensed to practice veterinary medicine in the state in which such treatment was given.

**4.** A DQP is employed by show management to inspect horses and determine if they are "sore." Management employs these individuals because it may be held liable under the Act if a "sore" horse is shown and a DQP was not utilized. 15 U.S.C. § 1824(3).

indicated that "something was done to the horse [to cause the pain]," (J.A. 72) and that this pain was not caused by other potential causes such as infection, "a stone bruise," or "founder." (J.A. 74).

Another USDA veterinarian, Dr. George Clawson, before learning of Dr. Critchfield's conclusion and without seeing his examination, independently examined Mark's Ebony Ace and got the same strong pain responses upon palpation of the front legs. Both doctors separately concluded that the horse was indeed "sore" as defined by the Act.

On June 8, 1989, Elliott paid the fee to enter "Delight's Big Boy" in a show in Dallas, North Carolina. Elliott's employee presented the horse for its inspection on June 10. The DQP first examined the horse and determined it to be "sore." USDA veterinarians Dr. David Kelly and Dr. William J. Martin independently examined the horse by palpating and examining for hair loss, tendon structure, lesions, or discoloration. Dr. Martin noted:

the skin of the [lower leg] appeared bright pink similar to a fair skinned individual who is sun burned. The hair coat was very sparse indicating, in my opinion, excessive wear by the use of action devices.... The posterior [lower leg] of the right forefoot was similarly colored and had hair loss identical to the left forefoot.

(Affidavit, J.A. 251). Dr. Martin further testified that the horse experienced extreme pain in both forelimbs and suffered from inflammation of the muscles. Dr. Kelly testified that the presence of pain in both of the horse's front legs was not the result of some type of accidental injury. Each veterinarian independently found the horse to be "sore" as the result of action devices or caustic chemicals.

On August 6, 1990, Elliott paid the fee to enter "This is It" in the Tennessee Walking Horse National Celebration at Shelbyville, Tennessee. Elliott presented the horse for inspection on August 24, 1990. Dr. Clawson observed the horse react as if in pain during the DQP's examination. The DQP rejected the horse as "sore" on both front feet. Dr. Clawson conducted an independent examination and noted that the horse exhibited pain responses to his palpation. Dr. Critchfield also noted "extreme pain" responses and both doctors concurred in the conclusion that the horse was "sore." Dr. Critchfield testified that such a reaction indicated that the horse was deliberately treated to cause the pain.

An administrative proceeding was held on January 31, 1990 on the three alleged violations of 15 U.S.C. § 1824(2)(B), i.e. "entering for the purposes of showing ... any horse which is sore...." Elliott admitted that he was the horses' trainer and that he "paid the entry fee and entered the horses in their respective horse shows." (Appellant's Brief 4). He denied that the horses were "sore" when entered or that it was proven they were "sore" at all. Elliott also argued that the Act was unconstitutional because it discriminated against owners and trainers of Walkers, because "entering" is vague, and because the Act creates a presumption that a horse is "sore" when the two forelegs are "abnormally sensitive."

The ALJ found that testimony established that the three horses were "sore" within the meaning of the Act when examined by the USDA veterinarians. He found that at the time of inspection the horses had already been "entered" because the respective horses were registered at that point for the show and that the Act did not cover the time period after entering and before showing. The ALJ, therefore, dismissed the complaint.

The APHIS appealed the decision to the JO. The JO determined that "entering" a horse included all those activities required to be completed before the horse could be shown, including inspection, not just registration. The JO stated:

the entering process is [not] somehow completed at a point certain sometime after the horse is signed in for the show, on the one hand, and the pre-show clearing by the Show–Steward or Veterinarian, on the other. To the contrary, the entering of the horse is a continuing process, not an event, and includes all

activities required to be completed before a horse can actually be shown or exhibited.

*In re Elliott,* No. 90–20, slip op. (Dept. Agric. May 14, 1992). The JO reasoned that including the initial sign-up in the entering process, but excluding the pre-show clearance examination would provide a "window-of-opportunity" to make a horse "sore," and neither the plain language of the Act allows this result nor could Congress have intended this result. The JO also rejected Elliott's arguments that the Act violated the Constitution because it was vague, discriminatory, or because it utilized a rebuttable presumption that a horse is "sore" when the horse is "abnormally sensitive" in both forelimbs.[5]

The JO imposed upon Elliott the maximum civil penalty of $2,000 for each of the three violations and a disqualification period of five years for each violation, to run consecutively. This appeal followed.

## II

■ A court's standard of review of agency decisions is to determine if the agency action is consistent with the authority granted by Congress and is supported by substantial evidence. *See, e.g., Universal Camera Corp. v. Labor Bd.,* 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456 (1951). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Consolidated Edison Co. v. NLRB,* 305 U.S. 197, 229, 59 S.Ct. 206, 216–17, 83 L.Ed. 126 (1938). Substantial evidence is more than a scintilla but less than a preponderance. *Laws v. Celebrezze,* 368 F.2d 640, 642 (4th Cir.1966). Even if we were to reach a different conclusion from the agency, the agency's reasonable choice, supported by substantial evidence, may not be overturned. *Consolo v. Federal Maritime Commission,* 383 U.S. 607, 620, 86 S.Ct. 1018, 1026–27, 16 L.Ed.2d 131 (1966).

■ With respect to an agency's interpretation of a statute, if a statute is plain on its face, there is no room for a contrary agency interpretation. When we review an agency's interpretation of a statute which is not plain on its face, we look first to the intent of Congress. If that intent is clear, then we and the agency are bound to give effect to it. *Chevron U.S.A. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 842, 104 S.Ct. 2778, 2781, 81 L.Ed.2d 694 (1984). If Congress explicitly leaves a gap in the legislation, then the agency has authority to fill that gap and the agency is entitled to deference on the question, unless the agency's action is "arbitrary, capricious, or manifestly contrary to the statute." *Id.* at 844, 104 S.Ct. at 2781–82. If, however, the statute is merely silent or ambiguous on a particular matter and no intent on the part of Congress can be discerned, the court is not bound to give effect to an unreasonable agency interpretation. *Id.*

## III

Congress enacted the Horse Protection Act to end the practice of deliberately making Walkers "sore" for the purpose of altering their natural gait and improving their performance at horse shows. When the front limbs of a horse have been deliberately made "sore," usually by using chains or chemicals, "the intense pain which the animal suffered when placing his forefeet on the ground would cause him to lift them up quickly and thrust them forward, reproducing exactly [the distinctive high-stepping gait of a champion Walker]." H.R.Rep. No. 91–1597, 91st Cong., 2d Sess. 2 (1970), *reprinted in* 1970 U.S.C.C.A.N. 4870, 4871. Congress' reasons for prohibiting this practice were twofold. First, it inflicted unnecessary pain on the animals; and second, those who made their animal "sore" gained an unfair competitive advantage over those who relied on skill and patience. In 1976, Congress significantly strengthened the Act by amending it to

---

5. 15 U.S.C. § 1825(d)(5) provides:
   In any civil or criminal action to enforce this chapter, a horse shall be presumed to be a
   horse which is sore if it manifests abnormal sensitivity or inflammation in both of its forelimbs or both of its hind limbs.

make clear that intent to make a horse "sore" is not a necessary element of a violation. *See Thornton v. U.S.D.A.,* 715 F.2d 1508, 1511–12 (11th Cir.1983).

Violators of the Act are subject to civil and criminal sanctions. A criminal penalty of not more than $3,000 and imprisonment for up to one year may be imposed for each knowing violation of the Act; and each subsequent violation can result in a penalty of $5,000 and imprisonment for up to two years. 15 U.S.C. § 1825(a)(1), (a)(2)(A). Civil penalties can include disqualification from association with horse shows and penalties of up to $2,000 for each violation. Disqualification is for a period of not less than one year for an initial violation and not less than five years for any subsequent violation.[6]

## IV

### A

■ Elliott asserts that "entering," as used in 15 U.S.C. § 1824(2)(B), constitutes only registration of the horse and payment of the entry fee. The time period between such time and the actual show, he asserts, is not included within the meaning of "entering." We cannot agree that "entering" means simply paying the fee and registering the horse for showing, which oftentimes is done by mail without the requirement for presenting the horse. Inspection of the horse is a prerequisite to the horse being eligible to show and the horse is not fully qualified to show until the inspection is passed. The plain meaning of "entering" a horse in a show would seem to encompass all the requirements—including inspection—and the time necessary to complete those requirements.

Even if we were to agree, however, that the plain meaning of the Act is not clear, the USDA's interpretation is entirely reasonable and consistent with Congressional intent and thus must be upheld. We think it stretches credulity to argue that Congress intended only to prohibit a horse being "sore" at registration or when being

shown and between that time the horse is permitted to be "sore." The Act was passed to end the practice of making horses sore and to quash the competitive advantage gained by cruelly making a horse "sore." Congress stated that its purpose was to "make it impossible for persons to show sored horses in nearly all horse shows." *See* H.R.Rep. No. 91–1597, 91st Cong., 2d Sess. 2, *reprinted in* 1970 U.S.C.C.A.N. 4870, 4871. Elliott's reading of the Act would defeat this purpose by effectively making meaningless pre-showing inspections which are not contemporaneous with the registration and payment of the entry fee. We conclude that the USDA's interpretation of "entering" is reasonable and not contrary to Congressional intent and thus we are bound to give it effect. *Chevron U.S.A.,* 467 U.S. at 842, 104 S.Ct. at 2781.

### B

■ Elliott also argues that the Act is vague and thus unconstitutional. A statute is not void for vagueness if it: (1) establishes "minimal guidelines to govern law enforcement," and (2) gives reasonable notice of the proscribed conduct. *Kolender v. Lawson,* 461 U.S. 352, 358, 103 S.Ct. 1855, 1858, 75 L.Ed.2d 903 (1983). A law is considered vague if "a person of normal intelligence must guess at its meaning and differ as to its application." *Connally v. General Construction,* 269 U.S. 385, 391, 46 S.Ct. 126, 127–28, 70 L.Ed. 322 (1926). A person of reasonable intelligence should have understood that the Act prohibits a trainer from making his horses "sore." Section 1821(3) plainly prohibits any practice which may "result [or] can reasonably be expected to [cause] physical pain, distress, inflammation or lameness...." Such explicit language clearly warns against the practice of making horses "sore," however it may be accomplished, and thus it does not violate due process.

■ Elliott also argues that the Act is vague because it fails to establish uniform

---

6. Prior to the three incidents in the case *sub judice,* Elliott had been found in violation of the Act and was, therefore, subject to the increased suspension period.

standards for examination and diagnoses by USDA veterinarians. In other words, he complains that the determination of "sore" depends on the subjective conclusion of the USDA veterinarian. In fact, the fact-finder makes the determination as to whether or not a horse was "sore". The USDA veterinarians merely provided evidence, through their diagnosis, as to whether or not this is the case. Their findings are subject to the same scrutiny as any other evidence. As one court ably put it:

[A]ccepting that the opinions of the examining veterinarians are subjective to a degree, that subjectivity is no more than that inherently present whenever expert opinion is used for evidentiary purposes in adjudicative proceedings. The evidentiary use of expert opinions, in particular those supported by live testimony and subject to the defendants' cross-examination, does not violate the due process clause. See e.g., *Richardson v. Perales*, 402 U.S. 389, 408, 91 S.Ct. 1420, 1430–31, 28 L.Ed.2d 842 (1971); *Lloyd Sabaudo Societa v. Elting*, 287 U.S. 329, 339–340, 53 S.Ct. 167, 172, 77 L.Ed. 341 (1932).

*Fleming v. USDA*, 713 F.2d 179, 186 (6th Cir.1983).

### C

Elliott further contends that the ALJ impermissibly relied on the statutory presumption that if a horse is "abnormally sensitive" it is deemed to be "sore." 15 U.S.C. § 1825(d)(5). Elliott argues that "abnormally sensitive" is so vague as to be violative of due process and that equating "abnormal sensitivity" to deliberate treatment to render a horse "sore" is an unwarranted and unsupported presumption. We find it unnecessary to consider the presumption established by § 1825(d)(5) in light of the direct evidence that the horses were "sore." The examining veterinarians did not simply conclude that the horses were abnormally sensitive in two limbs and, therefore, were "sore." Each veterinarian testified to the effect that the three horses plainly experienced a high degree of pain upon palpation of their forelimbs, demonstrated by the horses' immediate and reflexive pulling away from the palpation, rearing up and sagging down on the hindquarters, and instinctively cinching up the abdominal muscles. The diagnosis was not based upon mere abnormal sensitivity. The veterinarians specifically opined that the pain responses were not the result of some other type of injury but rather were deliberately inflicted. In other words, the horses, when inspected, were "sore" within the meaning of the Act. As previously discussed, the veterinarians noted other conditions indicating the horses were "sore": (1) hair loss which indicated the use of action devices or caustic chemicals; (2) inflammation in the forelimbs; and (3) unusual stance, movement and expression. The testimony was in the form of professional opinions linking cause and effect, not simple reliance on a statutory presumption. Although the ALJ cited the presumption, his opinion clearly shows he determined, based on the evidence presented, that the animals were "sore" on the days they were "entered." Unquestionably, substantial evidence supports those conclusions.[7] Where there is a factual finding that a horse was "sore", even in the absence of the presumption, it is irrelevant that there may have been reliance on a presumption. *Thornton v. USDA*, 715 F.2d 1508, 1511 (11th Cir. 1983) (citing *Fleming v. USDA*, 713 F.2d 179, 188 (6th Cir.1983)). We, therefore, find it unnecessary to examine whether or not the presumption passes constitutional muster. See *Usery v. Turner Elkhorn Mining Co.*, 428 U.S. 1, 96 S.Ct. 2882, 49 L.Ed.2d 752 (1976).

### V

Elliott raises a number of other assignments of error, and our review of the briefs and consideration of the arguments of the parties have revealed that these remaining points of error are without merit. Accordingly, for the reasons stated

---

**7.** Although Elliott presented the testimony of three lay persons contradicting the testimony of the veterinarians, the ALJ was entitled to credit the testimony of the veterinarians.

herein, the decision of the Secretary is affirmed.

**AFFIRMED.**