**Billy GRAY, Petitioner,**

v.

**UNITED STATES DEPARTMENT OF AGRICULTURE, Respondent.**

No. 93–3875.

United States Court of Appeals,
Sixth Circuit.

Argued Sept. 23, 1994.

Decided Nov. 10, 1994.

G. Thomas Blankenship (argued and briefed), Blankenship & Robbins, Indianapolis, IN, for petitioner.

Jeffrey Alan Knishkowy, U.S. Dept. of Agriculture, Stephen M. Reilly (briefed), Raymond Fullerton (argued), Office of Gen. Counsel, U.S. Dept. of Agriculture, Washington, DC, for respondent.

Before: KRUPANSKY, GUY, and NORRIS, Circuit Judges.

RALPH B. GUY, Jr., Circuit Judge.

Petitioner appeals a decision of the Secretary of the United States Department of Agriculture ("Secretary") finding that he violated section 5(2)(B) of the Horse Protection Act ("Act") as amended, 15 U.S.C. § 1824(2)(B). Petitioner argues that the evidence against him is insufficient to support the Secretary's decision and, alternatively, that, even if he did violate the Act, the civil sanctions he was assessed nevertheless

should be set aside. For the following reasons, we affirm.

## I.

Before setting forth the facts of this case, an examination of the relevant statutory framework is in order.

### A. Statutory Framework

Title 15 U.S.C. § 1824 prohibits the "entering for the purpose of showing or exhibiting in any horse show or horse exhibition, any horse which is sore[.]" 15 U.S.C. § 1824(2)(B). The Act defines "sore" in the following manner:

(3) The term "sore" when used to describe a horse means that—

(A) an irritating or blistering agent has been applied, internally or externally, by a person to any limb of a horse,

(B) any burn, cut, or laceration has been inflicted by a person on any limb of a horse,

(C) any tack, nail, screw, or chemical agent has been injected by a person into or used by a person on any limb of a horse, or

(D) any other substance or device has been used by a person on any limb of a horse or a person has engaged in a practice involving a horse,

and, as a result of such application, infliction, injection, use, or practice, such horse suffers, or can reasonably be expected to suffer, physical pain or distress, inflammation, or lameness when walking, trotting, or otherwise moving, except that such term does not include such an application, infliction, injection, use, or practice in connection with the therapeutic treatment of a horse by or under the supervision of a person licensed to practice veterinary medicine in the State in which such treatment was given.

*Id.* § 1821(3). Under the Act, a horse is presumed to be sore "if it manifests abnormal sensitivity or inflammation in both of its forelimbs or both of its hindlimbs." *Id.* § 1825(d)(5).

In a recent decision, the Fourth Circuit elaborated upon the purposes underlying the above-referenced provisions:

Congress enacted the Horse Protection Act to end the practice of deliberately making Walkers "sore" for the purpose of altering their natural gait and improving their performance at horse shows. When the front limbs of a horse have been deliberately made "sore," usually by using chains or chemicals, "the intense pain which the animal suffered when placing his forefeet on the ground would cause him to lift them up quickly and thrust them forward, reproducing exactly [the distinctive high-stepping gait of a champion Walker]." Congress' reasons for prohibiting this practice were two-fold. First, it inflicted unnecessary pain on the animals; and second, those who made their animal "sore" gained an unfair competitive advantage over those who relied on skill and patience. In 1976, Congress significantly strengthened the Act by amending it to make clear that intent to make a horse "sore" is not a necessary element of a violation.

*Elliott v. Administrator, Animal & Plant Health Inspection Serv.*, 990 F.2d 140, 144–45 (4th Cir.) (citation omitted), *cert. denied*, —— U.S. ——, 114 S.Ct. 191, 126 L.Ed.2d 149 (1993); *see also Thornton v. United States Dep't of Agric.*, 715 F.2d 1508, 1511 (11th Cir.1983).

Individuals found to have violated § 1824 are subject to civil and criminal penalties. In the case of the former, 15 U.S.C § 1825(b)(1) provides in pertinent part that "[a]ny person who violates section 1824 of this title shall be liable to the United States for a civil penalty of not more than $2,000 for each violation." The Secretary also may disqualify a person required to pay such a fine "from showing or exhibiting any horse . . . for a period of not less than one year for the first violation and not less than five years for any subsequent violation." 15 U.S.C. § 1825(c).

### B. Factual Background & Procedural History

In November 1987, Billy Gray, a horse trainer with 20 years of experience in the field, entered "Pride's Night Prowler"

("Night Prowler"), a Tennessee Walking Horse, in the 31st Southern Championship Charity Horse Show ("Southern Championship"). Prior to the commencement of the show, Night Prowler underwent an examination conducted by a Designated Qualified Person ("DQP").[1] As a result of this examination, Night Prowler was disqualified from the show.

Subsequently, Night Prowler was examined independently by two experienced USDA veterinarians, Owen W. Hester and James M. Rushing, who reached the same conclusion; namely, that Night Prowler was "sore." In an affidavit, Hester observed:

On Friday, November 6, 1987, while observing DQP's examine horses, I noticed a horse being examined by DQP Charles Thomas attempting to withdraw its foot from Mr. Thomas' hand upon palpation of both forelegs pastern area. Upon Mr. Thomas completing his examination, I asked Mr. Billy Gray to move the horse aside for my examination. I palpated the left and right pastern area of the forelegs in the flexed and extended positions. The horse attempted to withdraw his foot from my hand, tightened its abdominal muscles and shook its head upward when I applied normal digital pressure over the bulbs of the heels and the posterior medial and lateral aspects of pastern appearing extremely sensitive in these described areas. The horse exhibited similar expressions of sensitivity in the pastern area of both right and left forelegs.

Rushing's examination only confirmed what his colleague had already determined. Hester, who witnessed Rushing's examination, remarked:

I observed Dr. J.M. Rushing examine the horse and watched the horse exhibit similar responses to palpations as I had personally seen when Mr. Thomas palpated the horse. The horse when being palpated shuffled his weight somewhat and attempted to withdraw his forefeet, camped under and exhibited symptoms indicative of being "sored." Dr. Rushing asked Mr. Gray to lead the horse down the barn aisle. The horse did not lead freely on a loose rein, camped under in stride and on park. Dr. Rushing and I conferred and were in total agreement that the horse met the criteria for being diagnosed as a "sore" horse as defined by the Horse Protection Act....

Rushing also signed an affidavit, attesting to his observations:

On November 6, 1987, I performed a preshow examination of ... Night Prowler, presented by Billy Gray, owned by Bob Kilgore and Phil Haven. I picked up the horse's left foreleg and applied light digital palpation to the pastern area. The horse showed extreme sensitivity over the bulbs of the heel, both medial and lateral. Night Prowler would tense his abdominal muscles and move his foreleg when light digital palpation was applied. I then moved to the horse's right foreleg and found extreme sensitivity over the bulbs of the heels, both medial and lateral. Night Prowler would tense his abdominal muscles and move his foreleg when light digital palpation was applied.

Dr. O.W. Hester and I then observed the horse as he was led by Mr. Gray. The horse failed to lead fully and was cramped and tucked.

Mr. Gray had been informed by DQP Charles Thomas that his horse was found to be bilaterally sore and was unable to be shown.

I then informed Mr. Billy Gray that USDA had found his horse to be sore as defined by the Horse Protection Act.

In my professional opinion, Night Prowler was sore as defined by the Horse Protection Act.

The doctors documented their findings further by completing a USDA "Summary of Alleged Violations" form. Gray also was in-

---

1. Title 15 U.S.C. § 1823(c) provides in pertinent part: "The Secretary shall prescribe by regulation requirements for the appointment by the management of any horse show ... of persons [*e.g.,* DQPs] qualified to detect and diagnose a horse which is sore or to otherwise inspect horses for the purposes of enforcing this chapter."

*See also id.* § 1824(3) (prohibiting "[t]he failure by the management of any horse show or horse exhibition, which does not appoint and retain a person in accordance with section 1823(c) of this title, to disqualify from being shown or exhibited any horse which is sore[]").

terviewed by Lon E. Sutton, a USDA investigator, who recorded the substance of the interview in an interview log. Sutton noted:

Mr. Gray said he had been training walking horses for about 20 years. Mr. Gray acknowledged during the interview that he had been involved in numerous violations of the [Horse Protection Act]. Mr. Gray stated it was a joint decision between him and the owner to enter the horse in the show. He stated he actually entered the horse in the show, paid the entry fee, and transported the animal to the show. Mr. Gray stated he worked the horse about 15 minutes aday [sic] as he did all of his horses. Mr. Gray said he had full custody of the animals pertaining to the methods and training devices used to prepare the horse to show.... Mr. Gray acknowledged the feet of the horse were sensitive to palpation when DQP Thomas turned it down but did not agree it met criteria of a sore horse as defined by the Horse Protection Act.

In March 1990, the Administrator of the Animal and Plant Health Inspection Service (APHIS) filed a complaint, charging Gray with violating 15 U.S.C. § 1824(2)(B) by entering Night Prowler in the Southern Championship.[2] At a hearing held before an administrative law judge ("ALJ") in June 1991, APHIS introduced oral and documentary evidence (including the above-mentioned affidavits and Summary of Alleged Violation form) to support its claims. Gray responded by moving to dismiss the complaint, or, alternatively, for a judgment in his favor.

After the ALJ denied Gray's motion, Gray moved for the proceedings to be suspended to allow him to file an interlocutory appeal in federal district court to resolve issues pertaining to the burden of proof. Evidently, Gray made this motion assuming that the evidence admitted to that point was insufficient to establish a prima facie case against him. In this regard, Gray hoped that the district court would provide guidance as to "the necessity of presenting evidence in his

defense[.]" Once again, the ALJ denied Gray's motion.

Undeterred, Gray then notified the ALJ that he would file an interlocutory appeal to challenge the ALJ's decisions with respect to his motions to dismiss and to suspend the administrative proceedings. According to the government, Gray "stated that he 'will not be offering any evidence' but he did 'request the right to offer evidence at a later time.' " APHIS's counsel cautioned Gray that "there was a 'significant risk' in not going forward with evidence as the agency position is that 'the record is closed' at the conclusion of the hearing." (*Id.*) The hearing concluded without the ALJ ruling on Gray's request that he be able to offer evidence in a subsequent proceeding.

In December 1991, Gray filed a petition with the district court, seeking, *inter alia*, a declaration that the government had failed to establish a prima facie case against him. The government moved to dismiss, and the court granted the motion for lack of subject matter jurisdiction. *See Gray v. Madigan*, 796 F.Supp. 1093 (M.D.Tenn.1992).

In July 1992, Gray filed a motion to reopen his administrative hearing. The ALJ, though favorably inclined to Gray's position, did not immediately rule on the motion and, instead, certified the question of the correctness of reopening the proceedings to USDA's Judicial Officer ("JO"). The JO ruled against Gray, noting:

Respondent had a full opportunity to present evidence at the administrative hearing ... and elected for strategic reasons not to do so. It was Respondent's position that Complainant had failed to establish a prima facie case, and Respondent did not wish to permit Complainant to establish a prima facie case based upon Respondent's evidence. There is no basis whatever for permitting Respondent to reopen the hearing to present evidence, after Respondent elected not to do so at the original hearing. If Respondent is permitted to reopen the hearing in such circum-

---

2. The complaint also listed as respondents Robert F. Kilgore and Philip F. Havens, Night Prowler's owners, as well as Charlie Spencer, the trainer of another horse, also owned by Kilgore, that had been disqualified from the Southern Championship. Kilgore, Havens, and Spencer entered into consent decisions, however, and they are not, therefore, parties to this appeal.

stances, the same right would have to be given to all other Respondents, which would completely disrupt the administrative process of this Department. Such a procedure would result in additional delay and expense, detrimental to the public interest.

In a decision issued in December 1992, the ALJ concluded that Gray had violated the Act "by entering the horse 'Pride's Night Prowler' while 'sore,' for the purpose of showing or exhibiting." Pursuant to her decision, the ALJ assessed a civil penalty against Gray in the amount of $2,000 and disqualified him from entering, showing, or exhibiting any horse in any horse show, exhibition, or sale/auction for a period of one year.

Both parties appealed this decision. While APHIS argued that the ALJ erred by not disqualifying Gray, a repeat violator of the Act,[3] for the statutory minimum of five years, Gray sought the dismissal of APHIS's complaint or, alternatively, a remand to the ALJ for a rehearing. The JO subsequently affirmed Gray's fine and extended the period of his disqualification from one to five years. This appeal followed.

## II.

### A. Standard of Review

■ We review an administrative decision of the United States Department of Agriculture under the Act to determine "whether the proper legal standards were employed and substantial evidence supports the decision." *Fleming v. United States Dep't of Agric.*, 713 F.2d 179, 188 (6th Cir.1983). Substantial evidence, as we have previously explained,

is more than a mere scintilla. It means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." "Substantiality of the evidence must be based upon the record taken as a whole." "Substantial evidence is not simply some evidence, or even a great deal of evidence. Rather, the 'substantiality of evidence must take into account whatever in the record fairly detracts from its weight.'"

*Murphy v. Secretary of Health & Human Servs.*, 801 F.2d 182, 184 (6th Cir.1986) (citations omitted).

### B. Horse Protection Act Violation

Gray first takes issue with the Secretary's conclusion that he violated 15 U.S.C. § 1824(2)(B). In this regard, he asserts that "in order to satisfy the very definition of the violation alleged in this case, the Department must prove that [he] *entered* the horse, at a time when a specific *cause* created a specific *result* in the horse." Gray, then, would have us apply a three-part test to determine whether he has violated the Act. The government, on the other hand, frames the analysis somewhat differently. It urges a two-part test "based on the statutory elements of *entry* and *soreness*." (emphasis added). We need not resolve this dispute here, however, because we conclude that, even assuming the validity of his test, Gray's claim that he did not violate § 1824(2)(B) is untenable.[4]

■ In challenging the Secretary's decision, Gray disputes the reliability, probativeness, and substantiality of the evidence against him. For instance, he makes much of the fact that the government's key witnesses at his June 1991 hearing—Hester,

---

**3.** Gray previously had been found to have violated 15 U.S.C. § 1824(7), which proscribes the showing of any horse wearing or bearing a substance prohibited by the Secretary to prevent the soring of horses.

**4.** Indeed, it is not altogether clear that the two tests differ materially. Gray explains that the last two components of his test, causation and result, are merely "sub-elements of the 'soreness' requirement, divined from the statutory definition of 'sore.'" Gray's test thus makes explicit what is apparently implicit in the government's proposed analysis; the government, in arguing

that a showing of entry and soreness is all that is needed to give rise to a violation, assumes that the horse is "sore" as a result of actions taken by a person or persons in charge of the horse in question. In other words, a sore horse, by definition, has been subjected to an "application, infliction, injection, use or practice" proscribed by 15 U.S.C. § 1821(3)(A)-(D) (*i.e.*, Gray's "causation" requirement), and, as a consequence of such practice, either suffers or can be expected to suffer pain when walking (*i.e.*, Gray's "result" requirement).

Rushing, and Sutton—could not independently recall the facts and circumstances surrounding his alleged violation. As such, Gray insists, the primary evidence the ALJ and the Secretary relied upon to find a § 1824(2)(B) violation—comprised of the doctors' affidavits, the Summary of Alleged Violation form, and the interview summary prepared by Sutton—is suspect and cannot support the Secretary's ultimate decision.[5]

The Administrative Procedure Act (APA) provides that an agency conducting a hearing may receive "[a]ny oral or documentary evidence." 5 U.S.C. § 556(d). The APA adds, however, that "the agency as a matter of policy shall provide for the exclusion of irrelevant, immaterial, or unduly repetitious evidence." *Id.* On this point, the USDA's implementing regulations state: "Evidence which is immaterial, irrelevant, or unduly repetitious, or which is not of the sort upon which responsible persons are accustomed to rely, shall be excluded insofar as practicable." 7 C.F.R. § 1.141(g)(1)(iv) (1994).

The documentary evidence of which Gray complains is clearly the sort of evidence "upon which responsible persons are accustomed to rely." That this evidence is technically hearsay does not alter our conclusion. *See Calhoun v. Bailar,* 626 F.2d 145, 148 (9th Cir.1980) ("Not only is there no administrative rule of automatic exclusion for hearsay evidence, but the only limit to the admissibility of hearsay evidence is that it bear satisfactorily indicia of reliability."), *cert. denied,* 452 U.S. 906, 101 S.Ct. 3033, 69 L.Ed.2d 407 (1981). The *Calhoun* court commented: "We have stated the test of admissibility as requiring that the hearsay be probative and its use be fundamentally fair." *Id.* The documents at issue here satisfy these criteria. They were signed and/or prepared by individuals who were experienced in their tasks and who had no reason to record their findings in other than an impartial fashion. Moreover, the documents were created almost contemporaneously with the observations they relay.[6]

To determine that this evidence was probative and reliable, of course, is not to say that it also is substantial. Again, as our decision in *Murphy* makes clear, " '[s]ubstantiality of the evidence must be based upon the record taken as a whole.' " 801 F.2d at 184. Here, Gray provides little in the way of counter-evidence; rather, he disparages the government's evidence, arguing that it is insufficient to support the charge against him. Gray's position, however, is belied by the record.

With respect to whether Gray entered Night Prowler in the Southern Championship there can be little doubt. Gray not only paid the entry fee, but also transported the horse to the show. In addition, as the JO noted:

> Dr. Rushing stated that [Gray] presented the horse for inspection—such presentation being part of the entry process. Dr. Rushing also requested the name of the person entering the horse ... from the person presenting the horse ( [Gray] ) and wrote down the response—"Billy Gray." Consequently, the record contains reliable, probative and substantial evidence that [Gray] entered the horse.

*See also Elliott,* 990 F.2d at 145 (observing that "entering" a horse in a show entails paying the entry fee, registering the horse, and presenting the horse for inspection).

Equally unavailing is Gray's claim as to the sufficiency of the evidence pertaining to the condition of Night Prowler at the time Hester and Rushing conducted their examina-

---

5. This same argument was considered and rejected by the Third Circuit in *Wagner v. Department of Agric.,* 28 F.3d 279, 280 (3d Cir.1994). In *Wagner,* the court observed:

> In spite of petitioners' protestations to the contrary, it is well settled that affidavits are a form of probative evidence. Though live testimony may generally be favored over affidavits because the former permits cross-examination and credibility assessment, these interests are adequately safeguarded when, as in this case, the affiant appears in court. Though the doc-

tors' inability to recall their respective examinations of Sir Shaker impaired petitioners' ability to cross-examine as to examination itself, this does not upset our determination that the finding of soreness is supported by substantial evidence.

*Id.* at 282–83 (citations omitted).

6. At Gray's hearing, Hester and Rushing both testified that their affidavits reflected what they had found during their examination of Night Prowler.

tions. As is evident from their affidavits, Hester and Rushing confirmed independently what the DQP had already surmised; namely, that Night Prowler was "sore" within the meaning of the Act. For his part, Gray points out that Hester and Rushing characterized the sensitivity Night Prowler manifested in its forelimbs and hindlimbs as "extreme." Only "abnormal" sensitivity, Gray hastens to add, triggers the statutory presumption of soreness. *See* 15 U.S.C. § 1825(d)(5). Notwithstanding Hester's and Rushing's failure to employ the magic word, we reject Gray's contention. Put simply, to contend that "extreme" sensitivity is not also "abnormal" sensitivity ignores the meaning of both words.[7]

With respect to the cause of Night Prowler's sensitivity, we conclude that here, too, substantial evidence supports the JO's decision. At the June 1991 hearing, Rushing testified: "In my professional opinion, a horse that was sore would have had some abuse, perhaps resulting from the application of changing the chains, or action devices in conjunction with chemicals or substances applied to the front legs of the horse." He added: "[T]o my knowledge, there is no other means of producing this pattern of inflammation or soreness other than soring." This testimony led the JO to conclude that Night Prowler "was sored either by the use of a caustic agent or mechanical devices." To the extent causation is, as Gray urges, an element of a § 1824(2)(B) violation, we conclude that such element has been satisfied.

## C. Sanctions

▉ Next, Gray challenges the sanctions leveled against him. As noted above, Gray was required to pay a $2,000 penalty and was disqualified from showing, exhibiting, or entering horses for a period of five years. Specifically, Gray alleges that the JO failed to consider all of the factors relevant to the imposition of sanctions under the Act. These factors are set forth in 15 U.S.C. § 1825(b)(1), which provides in pertinent part:

> In determining the amount of such penalty, the Secretary shall take into account all factors relevant to such determination, including the nature, circumstances, extent and gravity of the prohibited conduct and, with respect to the person found to have engaged in such conduct, the degree of culpability, any history of prior offenses, ability to pay, effect on ability to continue to do business, and such other matters as justice may require.

"The scope of our review in this area is limited. 'Only if the remedy chosen is unwarranted in law or is without justification in fact should a court attempt to intervene in the matter.'" *Stamper v. Secretary of Agric.*, 722 F.2d 1483, 1489 (9th Cir.1984).

Notwithstanding Gray's assertion, our review of the record convinces us that the JO did, indeed, abide by the dictates of § 1825(b)(1). Initially, the JO touched on the gravity of the violation in dispute: "The violation in this case is extremely grave since this is exactly the type of inhumane and anticompetitive conduct that Congress intended to eliminate when they implemented the Act." After taking judicial notice of a previous case in which Gray was found to have violated the Act,[8] the JO commented on

---

7. Gray also asserts that the government may not prevail simply by resorting to the statutory presumption. Without implying approval of Gray's assertion, we note that neither the ALJ nor the JO relied on the presumption created by § 1825(d)(5). For instance, the ALJ stated: "Even without the presumption, the Complainant established a *prima facie* case that Gray violated the Act." The JO subsequently observed that "the ALJ correctly found that the evidence in the record established the horse was sore *without recourse to the presumption.*"

8. Gray's prior violation occurred in 1974, two years *before* the Act was amended to add the disqualification provision. This, however, does

not preclude the use of this prior violation to lengthen the period of Gray's disqualification. As the JO made clear: "It is well settled that crimes for which a defendant was convicted before a habitual offender statute was passed or amended may be used to invoke the increased penalties of such statute for a crime committed after the date on which it became effective." For this proposition, the JO relied in part on *Gryger v. Burke*, 334 U.S. 728, 68 S.Ct. 1256, 92 L.Ed. 1683 (1948), in which the Court, faced with a question largely analogous to the one in dispute, stated:

> Nor do we think the fact that one of the convictions that entered into the calculations by

the degree of Gray's culpability, Gray's ability to pay the penalty, and the appropriateness of disqualification as an additional sanction. In short, the JO imposed a sanction within statutory bounds pursuant to a thorough analysis that took into account all of the relevant factors. Accordingly, we reject Gray's challenge to the sanctions imposed against him.

**AFFIRMED.**

which petitioner became a fourth offender occurred before the Act was passed, makes the Act invalidly retroactive or subjects the petitioner to double jeopardy. The sentence as a fourth offender or habitual criminal is not to be viewed as either a new jeopardy or additional penalty for the earlier crimes. It is a stiffened penalty for the latest crime, which is considered to be an aggravated offense because a repetitive one.
*Id.* at 732, 68 S.Ct. at 1258. We feel the Court's reasoning applies with equal force in the present context.

We similarly are not persuaded by Gray's claim that, because his prior violation was not for "soring," it cannot now be invoked for purposes of 15 U.S.C. § 1825(c). In this regard, we note that a period of disqualification may be assessed under this section against "any person ... who paid a civil penalty assessed under subsection (b) of this section or is subject to a final order under such subsection assessing a civil penalty for *any* violation of *any* provision of this .chapter or *any* regulation issued under this chapter...." 15 U.S.C. § 1825(c) (emphasis added). The broad language Congress employed in crafting § 1825(c) clearly suggests that Congress intended that a prior violation of 15 U.S.C. § 1824(7) could trigger the longer disqualification period.