**NOT RECOMMENDED FOR FULL-TEXT PUBLICATION**
File Name: 06a0607n.06
Filed: August 22, 2006

**No. 05-3919**

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

| | | |
|---|---|---|
| JACKIE McCONNELL; CYNTHIA McCONNELL, | ) ) ) | |
| Petitioners, | ) ) | |
| v. | ) ) ) | ON PETITION FOR REVIEW OF AN ORDER OF THE SECRETARY, UNITED STATES DEPARTMENT OF AGRICULTURE |
| UNITED STATES DEPARTMENT OF AGRICULTURE, Animal and Plant Health Inspection Service; UNITED STATES OF AMERICA, | ) ) ) ) ) | |
| Respondents. | ) | |

**Before: BATCHELDER, CLAY, and ROGERS, Circuit Judges.**

**ROGERS, Circuit Judge.** Petitioners Cynthia and Jackie McConnell seek review of the decision of the United States Department of Agriculture (USDA) that they violated provisions of the Federal Horse Protection Act (Act) by shipping and entering into a horse show a "sore" Tennessee Walking Horse. A "sore" horse is a horse on which chemicals or other implements have been used on its front feet to make the horse highly sensitive to pain. This pain alters the horse's gait and causes the horse to lift its feet quickly, reproducing the distinctive, high-stepping gait that show judges look for in Tennessee Walking Horses. Cynthia, the trainer, agreed to an eight-month suspension of her training license imposed by an industry organization. The Administrator of the Animal and Plant Health Inspection Service (Administrator) later filed a complaint against her, and

the agency found that she shipped and entered a sore horse into a horse show. The Administrator also brought a complaint against Jackie, and the agency found that, as the horse's custodian, he entered, but did not ship, a sore horse.

The McConnells now challenge these findings, arguing that (1) substantial evidence does not support finding that they violated the Act, (2) the Department engaged in selective enforcement by filing a complaint against Jackie, (3) the Department breached an agreement not to file charges against Cynthia, and (4) the Department violated the McConnells' due process rights. We deny the petition.

## I.

The McConnells are married. Cynthia was a licensed trainer of Tennessee Walking Horses. She wholly owns and controls Whitter Stables, an unincorporated business in Collierville, Tennessee. Jackie is an employee of Whitter Stables and receives a monthly salary. Jackie's training license had been suspended three times prior to the events concerning his latest disqualification: two six-month disqualifications pursuant to consent orders and one two-year disqualification. *See McConnell v. U.S. Dep't of Agric.*, No. 93-4116, 1994 WL 162761, at *1 (6th Cir. Apr. 29, 1994) (order).

On or about August 26, 1998, Cynthia hired an independent contractor to ship a horse named Regal By Generator (Regal) to the Tennessee Walking Horse National Celebration in Shelbyville,

Tennessee. It is not disputed that Regal was within her care and control for the purposes of shipping and competing in the horse show.

The Act prohibits the "shipping" of sore horses and the "entering" of sore horses for, among other things, exhibition at horse shows. 15 U.S.C. § 1824(1) and (2). The statute proscribes the following:

> (1) The shipping, transporting, moving, delivering, or receiving of any horse which is sore with reason to believe that such horse while it is sore may be shown, exhibited, entered for the purpose of being shown or exhibited, sold, auctioned, or offered for sale, in any horse show, horse exhibition, or horse sale or auction . . . .
>
> (2) The . . . entering for the purpose of showing or exhibiting in any horse show or horse exhibition, any horse which is sore . . . .

15 U.S.C. § 1824. A "sore" horse is a horse on which chemicals or other implements have been used on its front feet to make the horse highly sensitive to pain. 15 U.S.C. § 1821(3). "A horse shall be presumed to be a horse which is sore if it manifests abnormal sensitivity or inflammation in both of its forelimbs or both of its hindlimbs." 15 U.S.C. § 1821(d)(5). Before competing at a horse show, the horses are examined by Designated Qualified Persons (DQPs) and Veterinarian Medical Officers (VMOs) to determine whether the horses are "sore." DQPs are employed by the management of a horse show to inspect the horses for soreness and to prevent sore horses from competing. The DQPs work under the supervision of VMOs. 9 C.F.R. §§ 11.7, 11.21.

On September 3, 1998, Jackie presented Regal for inspection at the horse show. Two DQPs examined Regal, and both found that the horse was sore. Two VMOs, Drs. Guedron and Kirsten,

then examined Regal and agreed with the DQPs that Regal was sore. When the examiners palpated the horse on its anterior pasterns, the horse exhibited mild to strong leg withdrawal. Dr. Guedron testified that the horse reared its head and withdrew its feet in response to the palpation. The two VMOs also found that Regal had "several, thick, firm, abraded" scars on its feet. At least one of the DQPs reexamined the horse, at Dr. Guedron's request, and did not agree with the VMOs that the scarring, by itself, indicated that Regal was sore. Dr. Guedron noted the DQP's disagreement in his report.

Cynthia testified that Regal had been shown three times from the date of shipment, August 26, until the date that Jackie presented Regal, September 3. She also testified that the horse had been inspected five times in the course of those three showings, and none of the inspectors cited her for having a sore horse. The McConnells did not call any of the prior inspectors to testify at the hearing. The McConnells had Regal inspected by two of their own veterinarians after the September 3 horse show, but they did not call those veterinarians to testify at the hearing.

Cynthia agreed to an eight-month suspension. Cynthia testified that she met with members of the National Horse Show Commission (NHSC) and USDA investigator James Odle in early September 1998 to discuss her options. The suspension-notice form from the NHSC says, "Reported Violation: USDA 8 MONTH SUSPENSION." J.A. 2036. She testified that Odle told her that if she took the eight-month industry suspension, the USDA would not file a complaint against her. In her brief, McConnell claims that her testimony was uncontradicted, but Odle did not testify to that

- 4 -

fact. Instead, he testified that the eight-month suspension from the NHSC would be appropriate if accepted by the USDA and served by Cynthia.

Dr. Ronald DeHaven was the acting associate administrator of the USDA, Animal and Plant Health Inspection Service in Washington, D.C. Dr. DeHaven testified that the agency attempted to create a Strategic Plan in which the horse organizations would take more responsibility for overseeing their members, but only one of eight or nine organizations accepted the plan. He testified that the agency made it known that it would retain "prosecutorial discretion" as to which cases it would pursue.

In September 1999, the Administrator filed a complaint against, as is relevant to this appeal, the McConnells and Whitter Stables, alleging that they shipped and entered a sore horse into a horse show in violation of the Act. Jackie argues on appeal that he is the first person disciplined for simply leading a horse to the inspection area. He alleges in his brief that he requested under the Freedom of Information Act that the USDA provide him with information concerning whether the USDA had ever before brought a complaint against the custodian, as opposed to the owner or trainer, of an allegedly "sore" horse. He alleges in his brief that the USDA failed to respond to his requests.

At the hearing and through affidavits, both VMOs, Drs. Guedron and Kirsten, testified that Regal was sore when it was presented for inspection on September 3. In response, the McConnells had the witnesses view the videotape of the examinations and comment on how their earlier

testimony compared to what they saw on the videotape. The McConnells primarily attempted to elicit testimony from Dr. Guedron that Regal did not rear its head or withdraw its foot when it was examined.

Dr. DeHaven testified as the USDA's rebuttal witness. On the advice of counsel, he refused to answer some questions concerning what he meant earlier on direct about the USDA's having "prosecutorial discretion." The McConnells saw DeHaven's testimony as necessary to demonstrate how decisions to file a complaint were handled, and the McConnells argue on appeal that the government was giving only the evidence that it wanted to give, not evidence that may have shown that the agency had targeted the McConnells. The McConnells also argue that their questions on cross-examination were related to matters discussed on direct. The government argued that it was afraid that permitting its witness to answer questions that were not relevant to the direct examination would create a dangerous precedent whereby the government's witnesses turn into the respondent's witnesses. The government also voiced concerns that Dr. DeHaven did not have permission from his supervisors to testify as to how the agency decides to file complaints.

Due to the retirement of one of the ALJs, two different ALJs presided over several sets of hearings, and the parties then filed separate proposed findings of fact and conclusions of law. In November 2003, the ALJ decided that Cynthia and Whitter Stables had shipped a sore horse and entered it into a horse show. The ALJ found that Jackie also entered a sore horse into a horse show. The ALJ, however, found that Jackie did not ship a sore horse because he did not have an ownership interest in Whitter Stables. The ALJ assessed Cynthia two "concurrent" $2,200 civil fines, which,

according to the ALJ, meant that one $2,200 payment would be satisfactory. The ALJ also disqualified Cynthia for one year for each violation. The ALJ said that these disqualifications were concurrent, and thus one year's suspension would satisfy both suspensions. The ALJ assessed Jackie a civil fine of $2,200 and disqualified him for five years for his one violation.

Both the Administrator and the McConnells appealed to the Judicial Officer, who makes the final adjudicatory decisions for the Secretary of Agriculture. 7 C.F.R. § 2.35. The Judicial Officer, for the issues germane to this appeal, affirmed. However, in response to the Administrator's concerns, he increased the sanctions against Cynthia by requiring her to pay $4,400 and disqualifying her from participating in a horse show for two years. The McConnells timely appealed to this court. 15 U.S.C. § 1825(b)(2).

## II.

We deny the petition because the Secretary applied the correct legal standards and because substantial evidence supports his conclusions. This court reviews

> an administrative decision of the United States Department of Agriculture under the Act to determine whether the proper legal standards were employed and substantial evidence supports the decision. Substantial evidence, as we have previously explained, is more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. Substantiality of the evidence must be based upon the record taken as a whole.

*Gray v. U.S. Dep't of Agric.*, 39 F.3d 670, 675 (6th Cir. 1994) (quotations and citations omitted); *see also* 15 U.S.C. § 1825(b)(2) (stating that courts of appeals review for substantial evidence when

the Secretary imposes fines for "sore" horse violations). First, substantial evidence supports the Secretary's findings that Cynthia shipped and entered into a horse show a sore horse and that Jackie entered into a horse show a sore horse. Second, Jackie's selective prosecution claim is meritless because it is uncontested that the Secretary files complaints against groups other than custodians. Third, Cynthia was not shielded from the Secretary's filing of a federal complaint simply because she accepted an eight-month industry suspension. Finally, the McConnells did not exhaust their several due process arguments because they failed to raise these claims on appeal to the Judicial Officer.

### 1. *Violations of the Act*

Substantial evidence supports the Secretary's determination that the McConnells violated the Act. The only issue that Cynthia raises regarding the two violations against her is whether there is substantial evidence to find that Regal was "sore" when she shipped and entered Regal into the show. A horse is presumed sore "if it manifests abnormal sensitivity or inflammation in both forelimbs or both of its hindlimbs." 15 U.S.C. § 1825(d)(5). There is substantial evidence that Regal was sore because Dr. Kirsten declared in his affidavit that two DQPs and two VMOs palpated each of Regal's pasterns and that Regal withdrew his feet in response to the palpations by each examiner. He also testified that the examiners received a bilateral response, as required by the statute for a violation. Dr. Guedron testified to the same effect, except that he did not see Dr. Kirsten's examination. This evidence is sufficient to support the Secretary's determination that Regal was sore.

The McConnells argue, however, that the record as a whole cannot support the Secretary's findings because other evidence detracts from the government's evidence. The McConnells argue that (1) the video establishes that the VMOs did not tell the truth, (2) Regal had previously been inspected seven other times between the shipping date and the disqualification date without having been disqualified, and (3) the DQPs did not agree that Regal had scar tissue. Jackie also argues that he did not "enter" Regal into the horse show by merely presenting her for inspection. None of these arguments is availing.

The McConnells' first argument fails because nothing in the video implies that the witnesses were lying. The McConnells introduced no expert evidence refuting any testimony of the veterinarians regarding the video that required expertise. Moreover, there is nothing in the video that would compel a non-expert to conclude that the veterinarians at the hearing misrepresented the events of the September 3 horse show. We have been able to discern, however, that the McConnells, in their brief, misrepresent various witnesses' statements made in response to the video played at the hearing. For instance, the McConnells state that, contrary to his earlier testimony, Dr. Guedron acknowledged on cross-examination, after viewing the video, that Regal did not rear its head or withdraw its foot during his examination. *See* McConnell Br. at 17. But the page of the record to which they refer does not indicate any such acknowledgment. Indeed, there is no discussion of rearing, and Dr. Guedron merely agrees that in one scene Regal moved his foot when Dr. Guedron moved it. *See* J.A. 290. Moreover, Dr. Guedron testified later that he would not agree that the horse did not rear its head, and he testified that he defines "rearing" as subtle movement of a horse's head

held high.  *See* J.A. 293-94; *see also* J.A. 295-96 (testifying that a horse holds its head high when it seeks to take weight off of sensitive forelimbs).  The witnesses' descriptions of the video, therefore, do not demonstrate that the record as a whole belies the Secretary's conclusions.

As for the McConnells' second argument, the Secretary could have found that Regal was sore on September 3 despite the fact that seven prior inspections revealed no soreness.  Although the approval of seven prior inspectors can create an inference that Regal was not sore, the inspectors' approval can also demonstrate that they were not as careful as they should have been or that they were not as expert as the VMOs working on September 3.  *See In re Joe Fleming*, 41 Agric. Dec. 38, 44 (1982), *aff'd*, 713 F.2d 179 (6th Cir. 1983) ("The fact that the horse in question passed the pre-show examination is not worthy of great weight when measured against the detailed evidence and findings of the post-show examiners.").  This court's discussion in *Fleming* of the legitimacy of post-show examinations provides reasons why one horse may not be disqualified in recent, prior examinations and yet be sore:

> Because of the number of horses involved the pre-show exam is necessarily short and cursory. . . . Moreover, the pre-show exam is not always conducted by a veterinarian and always involves local personnel who must deal with the interested parties on a daily basis.  Such personnel may be reluctant to disqualify a horse from being shown—especially since their decision is virtually unreviewable.

713 F.2d at 187 n.11.  The McConnells never introduced testimony of the inspectors that had earlier examined Regal, and thus the Secretary was merely left to speculate why these experts did not disqualify the horse.  The Secretary, however, was presented with testimony and documents

describing why the VMOs on September 3 found Regal sore. Therefore, the record as a whole supports the Secretary's findings despite the fact that earlier inspectors did not disqualify Regal.

Substantial evidence also supports the Secretary's finding that Regal was "sore" when shipped because Dr. Kirsten testified that Regal had scarring that had developed over a long period of time. Dr. Guedron also testified in his affidavit that he found scar tissue on Regal. Their findings are somewhat undercut by the fact that seven other inspectors and the two DQPs at the September 3 horse show never reported any other scar-rule violations. But the fact that several inspectors never reported a scar-rule violation does not mean that Regal did not have the scarring that the two veterinarians reported. Moreover, even if these inspections were inconsistent with one another, the McConnells never called to the stand the prior examiners, the DQPs who disagreed with the VMOs, or the two veterinarians that the McConnells had examine Regal immediately after the examination. The McConnells also never established any motive for the VMOs to exaggerate or lie about the scarring, and it would appear difficult to do so, considering that Dr. Guedron stated clearly in his report that one of the DQPs found to the contrary. It could simply be that these two VMOs were better than other examiners at discovering subtle scarring or that the VMOs considered the scarring more pronounced than others. For these reasons, there is substantial evidence to support the Secretary's findings as to Cynthia.

As for Jackie, Jackie "entered" a sore horse by merely presenting Regal for inspection. The Act does not define "entering," *see* 15 U.S.C. § 1824, but this court has cited approvingly *Elliott v. Administrator, Animal and Plant Health Inspection Service*, 990 F.2d 140, 145 (4th Cir. 1993), for

the proposition that "entering" a horse includes not only paying the entry fee and registering the horse but also presenting the horse for inspection. *See Gray*, 39 F.3d at 676. As the Fourth Circuit noted, "Inspection of the horse is a prerequisite to the horse being eligible to show and the horse is not fully qualified to show until the inspection is passed." *Elliott*, 990 F.2d at 145. Jackie presented Regal to inspection, so he "entered" a sore horse. Jackie offers no substantial reason to disturb *Elliott*'s and *Gray*'s common-sense observation that one enters a horse when one presents it for inspection at a horse show. Therefore, substantial evidence supports the Secretary's conclusion that Jackie "entered" a sore horse in a horse show.

## 2. *Alleged selective enforcement or prosecution of the Act*

Jackie's selective enforcement claim also fails because he cannot satisfy the requirements for a selective enforcement claim. Jackie's main argument is that no other custodian that has presented horses for inspection has been targeted by the USDA. For selective prosecution:

> First, [the prosecutor] must single out a person belonging to an identifiable group, such as those of a particular race or religion, or a group exercising constitutional rights, for prosecution even though he has decided not to prosecute persons not belonging to that group in similar situations. Second, he must initiate the prosecution with a discriminatory purpose. Finally, the prosecution must have a discriminatory effect on the group which the defendant belongs to.

*United States v. Anderson*, 923 F.2d 450, 453 (6th Cir. 1991). Jackie's claim cannot satisfy the first requirement, and thus it is not necessary for us to consider the other two factors. Even if one assumes that custodians are an identifiable group, it is not disputed that the Secretary prosecutes

others, such as trainers and owners, outside the class of custodians when inspectors determine a horse is sore. Jackie has failed, therefore, to establish a claim of selective enforcement.

### 3. Industry suspension in lieu of federal administrative complaint

Substantial evidence also supports the Secretary's finding that Cynthia's acceptance of an industry suspension did not preclude the USDA from filing a complaint against her. Despite Cynthia's testimony that she thought that her acceptance of an industry suspension would preclude federal enforcement, the Secretary found that, because there was no meeting of the minds, there was no agreement between the NHSC and the USDA that the government would not enforce the Act if the industry punished the violating members. Dr. DeHaven testified that only one of several horse industries accepted the proposal. He also testified that he told Cynthia's counsel only that he would notify her before any federal complaint was filed against Cynthia, not that she would not be the subject of a federal complaint. The Secretary's conclusion, therefore, is supported by substantial evidence.

The McConnells argue, however, that Cynthia entered into an agreement with James Odle that she would not be targeted by the agency if she accepted an industry suspension. But James Odle never testified that he told McConnell that the eight-month suspension was sufficient or that, if she accepted the industry suspension, the agency would not file a complaint against her. *See* J.A. 681-

82, 687-88, 709, 712.[1]  Although the Suspension Notice form from NHSC stated that Cynthia was serving a "USDA 8 MONTH SUSPENSION," Odle testified that there is no such thing as a "USDA suspension" and that the terminology should not be attributed to him because he does not use such terminology and because the agreement was between the industry and Cynthia.  Substantial evidence, therefore, supports the Secretary's findings that there was no agreement between Cynthia and the government that would preclude the government from filing a complaint against her.

4.      *Alleged Department violation of the McConnells' due process rights*

Because the McConnells have failed to exhaust their due process arguments by presenting them to the Judicial Officer on administrative appeal, we refuse to consider these arguments now. Agriculture Department regulations require appealing parties to list all of the issues appealed to the Judicial Officer.  *See* 7 C.F.R. § 1.145(a).  When appealing to the Judicial Officer, the McConnells raised the following issues:  (1) whether Cynthia "shipped" a sore horse; (2) whether Cynthia served an appropriate penalty; (3) whether Cynthia was subject to malicious prosecution and selective

---

[1]The McConnells' brief misrepresents the record in several places.  For instance, the McConnells' brief says that Odle thought that an eight-month suspension was an acceptable punishment for Cynthia.  *See* McConnell Br. at 38 (referring to J.A. 709, 712).  But Odle said, instead, that "[i]t was not his understanding" that "the USDA would forego any other additional penalties" after the industry imposed a suspension.  J.A. 709.  He also stated that Cynthia's penalty would be appropriate "if it is served and approved and accepted by the U.S. Department of Agriculture."  J.A. 712.  Even more troubling is the allegation that Odle informed McConnell on September 4, 1998, that the USDA suspension was eight months.  McConnell Br. at 38 (referring to J.A. 807).  But Joint Appendix page 807 concerns, instead, a conversation on February 17, 1999, with Jackie's counsel about enforcement in Oregon and California.  *See* J.A. 807.  Although we attempted to discuss these and other inconsistencies with the McConnells' counsel at oral argument, counsel's failure to bring copies of the Joint Appendix with him limited our discussion.

enforcement; (4) whether Jackie "entered" a sore horse; and (5) whether Jackie was subject to selective enforcement and malicious prosecution. *See* J.A. 24-28. This opinion addresses all of these issues.[2] In their briefs to this court, the McConnells also challenge the ALJ's decisions regarding their FOIA requests,[3] their surprise at the introduction of unannounced exhibits, their subpoenas of government employees, and their inability to confront Dr. DeHaven. The McConnells offer no reason for this court to review issues not exhausted in compliance with agency regulations. *Cf. South Carolina v. U.S. Dep't of Labor*, 795 F.2d 375, 378 (4th Cir. 1986); *Sears, Roebuck & Co. v. FTC*, 676 F.2d 385, 398 n.26 (9th Cir. 1982); *cf. also Sims v. Apfel*, 530 U.S. 103, 108 (2000) (noting that courts have declined to review issues that the appealing party, in contravention of agency regulations, has not exhausted). Therefore, we do not review the McConnells' arguments concerning their FOIA requests, limited discovery, and inability to confront Dr. DeHaven.

## III.

For the foregoing reasons, we deny the petition for review.

---

[2]Cynthia has not appealed the selective enforcement issue to this court. *See* McConnell Br. at 2, 36.

[3]The Judicial Officer dealt with the McConnells' FOIA requests in the part of his opinion concerning whether Cynthia was selectively prosecuted. *See* J.A. 68. The McConnells now mention their FOIA denials as part of their due process claims. *See* McConnell Br. at 26, 28. Because the these claims differ and require different inquiries, the FOIA/due process claim has not been preserved. Moreover, the McConnells point to no evidence in the record concerning their FOIA requests. The denial of the FOIA requests is not sufficiently developed as a due process claim for appellate review. *Dillery v. City of Sandusky*, 398 F.3d 562, 569 (6th Cir. 2005) ("It is well-established that 'issues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived.'") (citation omitted).