William Earl BOBO; Jack Mitchell, Petitioners,

v.

UNITED STATES DEPARTMENT OF AGRICULTURE, Respondent.

No. 94–3311.

United States Court of Appeals, Sixth Circuit.

Argued March 20, 1995.

Decided May 5, 1995.

G. Thomas Blankenship (argued), Blankenship & Robbins, Indianapolis, IN, John M. Harmon (briefed), Boyce C. Cabiness (briefed), Graves, Dougherty, Hearon & Moody, Austin, TX, for petitioners.

Jeffrey Alan Knishkowy (argued and briefed), U.S. Dept. of Agriculture, Washington, DC, for respondent.

Before: MILBURN and NELSON, Circuit Judges; JOINER,* District Judge.

MILBURN, Circuit Judge.

Petitioners William Earl Bobo and Jack Mitchell seek review of the decision of the Secretary of Agriculture pursuant to the Horse Protection Act ("HPA"), 15 U.S.C. § 1821, *et seq.*, assessing civil penalties and prohibiting petitioners from showing or entering horses for a period of two years, based upon the finding that petitioners had on two previous occasions showed a Tennessee Walking Horse, Ultimate Beam, at a horse show while the horse was "sore." On appeal, the issues are (1) whether "soreness" under the HPA can be determined based solely upon a horse's reaction to digital palpation; and (2) whether substantial evidence supports the finding of the administrative law

---

* The Honorable Charles W. Joiner, United States District Judge for the Eastern District of Michigan, sitting by designation.

judge ("ALJ") that the horse, Ultimate Beam, was "sore" within the meaning of the HPA at the time of the two horse shows, which were held in May and July 1990. For the reasons that follow, the petition for review is denied.

## I.

### A.

On August 13, 1991, the Administrator of Animal and Plant Health Inspection Service ("APHIS") filed a complaint against petitioners.[1] The amended complaint alleged that petitioners Bobo and Mitchell violated the HPA, 15 U.S.C. § 1824(2), on two occasions: (1) on May 26, 1990, by entering and allowing the entry of a horse, Ultimate Beam, for showing while the horse was "sore," and (2) on July 21, 1990, by entering and exhibiting and allowing the entry and exhibition of the same horse while the horse was "sore." The Administrator of APHIS sought the imposition of civil penalties against petitioners under § 6(b) of the HPA and the disqualification of petitioners from significant participation in the horse industry under § 6(c) of the Act, 15 U.S.C. § 1825(b), (c). Petitioners filed a timely answer on September 23, 1991, denying the material allegations in the complaint.

A hearing was held before an ALJ in Nashville, Tennessee, from December 14 through December 17, 1992. On July 14, 1993, the ALJ issued a decision and order in which he determined that Ultimate Beam had been "sore" within the meaning of the HPA on May 26, 1990, and again on July 21, 1990. The ALJ assessed a civil penalty of $2000 against petitioner Bobo and petitioner Mitchell, and he disqualified both petitioners from showing or exhibiting horses for a period of two years.

On October 13, 1993, petitioners filed an appeal with the United States Department of Agriculture ("USDA") Judicial Officer ("JO"). In a decision and order dated January 12, 1994, the JO affirmed the ALJ's decision and order and adopted the findings of the ALJ with minimal modifications. On January 31, 1993, petitioners filed a petition for reconsideration of the JO's decision and order, which was denied by the JO on February 28, 1994. Thereafter, on March 24, 1994, petitioners filed a petition for review of the Secretary's decision in this court.

### B.

This case involves a determination by the USDA that Ultimate Beam, a Tennessee Walking Horse, which was trained by petitioner William Earl Bobo and owned by petitioner Jack Mitchell was "sore" as defined by the HPA when the horse was entered in two horse shows held in May and July 1990.

Petitioner Bobo entered Ultimate Beam in the Twentieth Annual Dominion Bank Spring Fun Show at Shelbyville, Tennessee, on May 26, 1990. Mr. Bobo signed the entry form for Ultimate Beam and delivered it, along with the entry fee, to the management of the Horse show. Mr. Bobo also testified that he entered Ultimate Beam in the Fun Show.

The stallion, Ultimate Beam, was examined by the Designated Qualified Person ("DQP"), Charles Thomas, at approximately 9 p.m. on May 26, 1990. DQP Thomas' examination was performed prior to the start of the scheduled competition. DQP Thomas found that Ultimate Beam was "sensitive" in both front feet, and he excused the horse from competition. Mr. Thomas testified that his finding of "sensitive" meant that Ultimate Beam repeatedly moved his feet in reaction to palpation of specific areas of both pasterns.

Immediately following DQP Thomas' examination, Ultimate Beam was examined by two USDA veterinarians, George Clawson, D.V.M., and Tyler Riggins, D.V.M., who were the Veterinary Medical Officers ("VMOs") assigned to examine the horses at the Shelbyville Fun Show. Both veterinarians independently observed that Ultimate Beam exhibited pain responses to their palpations of the anterior pasterns of both forelegs and the posterior pastern of the left foreleg. The

---

1. The complaint was subsequently amended on the first day of the administrative hearing, December 14, 1992.

pain was extreme in the right leg. Ultimate Beam demonstrated his pain by jerking his foot and tightening his abdominal muscles when pressure was applied to the anterior pasterns of both forelegs. In addition, the horse raised his head in response to pressure on the anterior pastern of his right foreleg.

Drs. Clawson and Riggins concluded that the pain responses exhibited by Ultimate Beam did not result from natural causes. Dr. Clawson recorded his opinion that the pain exhibited by Ultimate Beam resulted from "abuse[ ] with mechanical devices or chemicals during training." J.A. 98. Dr. Riggins recorded his opinion that the condition of the horse "was caused by caustic chemicals or mechanical devices or a combination of both." J.A. 100, 101.

Both veterinarians agreed that Ultimate Beam was "sore" as defined in the HPA. If both veterinarians had not agreed that Ultimate Beam was "sore," no violation action would have been initiated.

Dr. Clawson prepared a Summary of Alleged Violations, VS Form 19–7, which was later signed by both veterinarians. The summary described the location and nature of the pain exhibited by Ultimate Beam and stated that the horse met the criteria for being "sore" as defined in the HPA. Each veterinarian prepared an affidavit recording the results of his examination of Ultimate Beam. Although both Dr. Clawson and Dr. Riggins testified that they had no independent recollection of the examination of Ultimate Beam at the time of the hearing in this case, each testified that he prepared the affidavit recording the results of his examination shortly after the examination and while the event was fresh in his mind. In addition, both Drs. Clawson and Riggins testified that in palpating a horse's pastern, they employ examination methods that would distinguish consistent and localized pain response to palpation from the reaction of a nervous or skittish horse, which generally would react to touching anywhere on its foot.

Subsequently, petitioner Bobo entered Ultimate Beam as Entry 27, Class 13, in the Twenty–Second Annual Albertville Horse Show at Albertville, Alabama, on July 21, 1990. Mr. Bobo signed the class sheet and paid Ultimate Beam's entry fee for the Albertville show. Mr. Bobo testified that he prepared Ultimate Beam for show and that he presented him for both pre-show and post-show examinations.

Ultimate Beam wore chains while in the show ring at the Albertville show. Because Ultimate Beam placed first in his class, he was examined after the show by two USDA veterinarians, Gerald Dienhart, D.V.M., and Lowell Wood, D.V.M.

Dr. Dienhart was completing his training in the detection of "soreness" under the Act, and he was gaining experience in the detection of "soreness" under Dr. Wood's supervision. On the other hand, Dr. Wood had extensive experience in examining horses to determine if they were in compliance with the HPA.

Each veterinarian independently examined Ultimate Beam and observed pain responses to his palpations of the posterior and anterior pasterns of the forelegs. Both Dr. Dienhart and Dr. Wood concluded that Ultimate Beam was "sore" as defined by the HPA.

Shortly after the examinations by the two veterinarians, Dr. Wood prepared a Summary of Alleged Violations, VS Form 19–7, which was signed by both Dr. Dienhart and Dr. Wood. The summary stated that the horse was "sore" and depicted the affected areas of the horse's pasterns in diagrams.

Dr. Wood testified that he did not have any independent recollection of the examination on July 21, 1990, but that he prepared an affidavit in which he recorded his findings shortly after the events described in the affidavit and while they were still fresh in his mind. Dr. Wood stated that Ultimate Beam demonstrated pain by withdrawing his foot when light to moderate digital pressure was applied to the following areas of each foreleg: an area on the anterior pastern ranging from medial to lateral, beginning about two centimeters above the coronary band and proceeding proximally for about three centimeters; and an area above the medial bulb of the heel on the posterior pastern ranging proximally and medially toward the medial pastern joint area.

Dr. Dienhart also prepared an affidavit shortly after the examination of Ultimate Beam, while the event was still fresh in his mind. Dr. Deinhart stated that the horse elicited strong, consistent, and repeatable pain responses during both his examination and Dr. Wood's examination. He stated that Ultimate Beam withdrew his foot, jerked his head and tightened his abdominal musculature in response to the palpation of the following areas of both forelegs: an area of the anterior pastern one inch above the coronary band, both medial and lateral; and an area above the bulb of the heel on the medial side of the posterior pastern. Dr. Dienhart recorded his opinion that Ultimate Beam's pain responses were caused by a caustic chemical, a mechanical device, or both.

In addition, Dr. Dienhart did recall his examination of Ultimate Beam as well as the horse's responses during the examination. Dr. Dienhart testified that in palpating Ultimate Beam's pasterns he applied light to moderate pressure. Dr. Dienhart testified that his conclusion that Ultimate Beam's "soreness" was caused by unnatural means was based upon the localized nature of the horse's pain responses and the absence of evidence of disease or injury. It was Dr. Dienhart's opinion that a horse with the pain responses exhibited by Ultimate Beam would suffer pain when moving.

Dr. Wood testified that in examining a horse under the HPA, he looks for consistent and repeatable pain responses and requires a strong withdrawal response before he concludes that a horse is "sore." Dr. Wood also testified that it was his practice to give the benefit of any doubt to the horse's owner and that he would not find a horse "sore" if it were merely sensitive.

Dr. Wood testified that it was his opinion, based upon his examination, that Ultimate Beam would have been in pain when wearing chains in the show ring. Dr. Wood also stated that based upon his findings, he would have expected Ultimate Beam to exhibit the exaggerated gait known as the "big lick." Dr. Wood further testified that his determination that the painful areas on a horse's pasterns are the result of prohibited means is based upon the intensity of the pain, bilateral patterns of responses, and the absence of any signs of injury or disease. This timely appeal followed.

## II.

### A.

Petitioners argue that the finding of the Secretary that Ultimate Beam was "sore" on May 26 and July 21, 1990, is not supported by substantial evidence for two reasons. First, they assert that the finding of "soreness" on the two occasions is not supported by substantial evidence because the findings of "soreness" are "based solely on evidence that the horse moved its feet in response to digital palpation." Brief of Petitioners at 2. Second, petitioners assert that the finding of "soreness" on the two occasions is not supported by substantial evidence because the ALJ accepted the testimony of the four VMOs, Drs. Clawson, Riggins, Dienhart, and Wood, over the testimony of other witnesses with better qualifications that Ultimate Beam's reaction to digital palpation was due to his high strung or fractious nature.

■ "We review an administrative decision of the [USDA] under the [HPA] to determine 'whether the proper legal standards were employed and substantial evidence supports the decision.'" *Gray v. United States Dep't of Agric.*, 39 F.3d 670, 675 (6th Cir.1994) (quoting *Fleming v. United States Dep't of Agric.*, 713 F.2d 179, 188 (6th Cir.1983)). "Substantial evidence is 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Elliott v. Administrator, Animal and Plant Health Inspection Serv.*, 990 F.2d 140, 144 (4th Cir.) (quoting *Consolidated Edison Co. v. N.L.R.B.*, 305 U.S. 197, 229, 59 S.Ct. 206, 216, 83 L.Ed. 126 (1938)), *cert. denied*, —— U.S. ——, 114 S.Ct. 191, 126 L.Ed.2d 149 (1993). Substantial evidence means "more than a scintilla but less than a preponderance" of the evidence. *Id.* "'Substantiality of the evidence must be based upon the record taken as a whole. Substantial evidence is not simply some evidence, or even a great deal of evidence. Rather, the "substantiality of evidence must take into account whatever in the record fairly de-

tracts from its weight." ' " *Gray,* 39 F.3d at 675 (quoting *Murphy v. Secretary of Health & Human Servs.,* 801 F.2d 182, 184, (6th Cir.1986) (citations omitted). Furthermore, "[i]f the ultimate findings and conclusions could reasonably have been drawn from the primary evidentiary facts we, as a reviewing court, may not 'displace the .... [Secretary's] choice between two fairly conflicting views, even though the court would justifiably have made a different choice had the matter been before it de novo.'" *Thornton v. United States Dep't of Agric.,* 715 F.2d 1508, 1510 (11th Cir.1983) (quoting *Universal Camera Corp. v. N.L.R.B.,* 340 U.S. 474, 488, 71 S.Ct. 456, 465, 95 L.Ed. 456 (1951)).

### B.

■ Petitioners argue that "soreness" under the HPA cannot be based solely on a horse's reaction to digital palpation. The HPA, 15 U.S.C. § 1824, prohibits showing a "sore" horse. To establish a violation of § 1824(2), the government must show by a preponderance of the evidence: (1) that the individual charged with violating the HPA is the owner of the horse in question, (2) that the horse was entered, shown, or exhibited in a horse show or exhibition, (3) that the horse was "sore" at the time it was shown, exhibited, or entered in a show or exhibition, and (4) that the owner permitted such showing, exhibition, or entry. *Rowland v. United States Dep't of Agric.,* 43 F.3d 1112, 1114 (6th Cir. 1995) (quoting *Baird v. United States Dep't of Agric.,* 39 F.3d 131, 137 (6th Cir.1994)).

Only the third element of a § 1824(2) violation is at issue in this case; namely, whether Ultimate Beam was "sore" on May 26, 1990, and July 21, 1990. The HPA, 15 U.S.C. § 1825(d)(5), provides:

In any civil or criminal action to enforce this chapter or any regulation under this chapter a horse shall be presumed to be a horse which is sore if it manifests abnormal sensitivity or inflammation in both of its forelimbs or both of its hindlimbs.

Petitioners assert that a VMO examination which relies solely on digital palpation cannot be a basis to invoke the presumption of § 1825(d)(5). For their arguments petitioners rely on a proviso in the "salaries and

expenses" appropriation for APHIS for Fiscal Year 1993, which reads in relevant part:

For expenses, ... to carry out inspection, quarantine, and regulatory activities; ... $432,900,000, ...:

*Provided further,* That none of these funds shall be used to pay the salary of any Department veterinarian or Veterinary Medical Officer who, when conducting inspections at horse shows, exhibitions, sales, or auctions under the Horse Protection Act, as amended (15 U.S.C. 1821 1831), relies solely on the use of digital palpation as the only diagnostic test to determine whether or not a horse is sore under such Act.

Pub.L. No. 102–341, 106 Stat. 873, 881–82 (1992). For fiscal year 1994, the Senate Report on appropriations for APHIS stated:

*Horse Protection*—The Committee recommends bill language identical to that in the 1993 act requiring APHIS not to rely solely on the use of digital palpation as the only diagnostic test to determine whether or not a horse is sore under the Horse Protection Act.

S.Rep. No. 102, 103d Cong., 1st Sess. at 46, 48 (1993). The House Report for Fiscal Year 1994 contained no limiting language. The Conference Report stated:

Funding provided in the bill to carry out activities of the Horse Protection Act includes an increase of $120,000. The conferees agree that these additional funds shall be used to purchase thermograph machines and to provide additional training and evaluation. Neither these machines nor digital palpation should be used as the sole means to determine whether soring has occurred, but they should be used as additional diagnostic tools.

H.R. Conf. Rep. No. 212, 103d Cong., 1st Sess. at 22–23 (1993). Finally, petitioners rely on the fact that on March 22, 1994, USDA issued new examination guidelines for determining "soreness" under the HPA. The new guidelines provide that VMOs and DQPs should evaluate the horse's appearance and gait, should examine each limb of the horse from the shoulder to the hoof of the forelimbs and from the thigh to the hoof of

the rear limbs, that the horse's feet should then be palpated, and that the horse should then be checked for improper action devices. Brief of Petitioners at Addendum B.

However, the new guidelines for examination by a VMO explicitly state that the guidelines "are not intended to supersede the [HPA] or the implementing regulations issued thereunder (9 C.F.R. Chapter 1, Subpart A, Part II)." *Id.* The regulations implementing the HPA are found at 9 C.F.R. Part 11 (1990). The regulation governing inspection and detention of horses, 9 C.F.R. § 11.1 (1990), provides:

> Inspection means the examination of any horse and any records pertaining to any horse by use of whatever means are deemed appropriate and necessary for the purpose of determining compliance with the Act and regulations. Such inspection may include, but is not limited to, visual examination of a horse and records, actual physical examination of a horse including touching, rubbing, palpating and observation of vital signs, and the use of any diagnostic device or instrument....

It is the Secretary's interpretation of his own regulations that evidence based on palpation alone may serve as the basis for a finding of "soreness" under the HPA. Brief of Respondent at 37. *See also In re Tuck*, 53 Agric. Dec. 261, 1994 WL 271821 at *21, *23 (1994) ("Frequently, in [HPA] cases, the evidence relates solely to observations based on palpation. [P]alpation alone is a highly reliable method of determining whether a horse is sore, within the meaning of the [HPA].").

■ The standard of review of an agency's interpretation of its own regulations is narrow. "[P]rovided an agency's interpretation of its own regulations does not violate the Constitution or a federal statute, it must be given 'controlling weight unless it is plainly erroneous or inconsistent with the regulation.'" *Stinson v. United States*, —— U.S. ——, ——, 113 S.Ct. 1913, 1919, 123 L.Ed.2d 598 (1993) (citations omitted).

■ The witnesses presented by petitioners, particularly Drs. Proctor and Johnson, testified that other factors, in addition to palpation, should be considered when determining whether a horse is "sore." These witnesses expressed the view that other signs, such as lameness or inflammation, must be present in addition to a reaction to digital palpation, before a horse can be found to be "sore." However, pursuant to 15 U.S.C. § 1821(3), a horse need only "reasonably be expected to suffer, physical pain or distress, inflammation, or lameness," to be considered "sore" within the meaning of the HPA. Thus, pursuant to the statute, the agency need not show inflammation or lameness in addition to a pain reaction in order to conclude that a horse is "sore" under the HPA.

Furthermore, neither the proviso in APHIS's "salaries and expenses" appropriation for Fiscal Year 1993 nor the statements in the Senate and Conference Reports for Fiscal Year 1994, as relied on by petitioners, renders the Secretary's interpretation of his regulations either "plainly erroneous or inconsistent." *Stinson*, —— U.S. at ——, 113 S.Ct. at 1919.

"[W]hen Congress desires to suspend or repeal a statute in force, '[t]here can be no doubt that ... it could accomplish its purpose by an amendment to an appropriation bill, or otherwise.'" *United States v. Will*, 449 U.S. 200, 222, 101 S.Ct. 471, 484, 66 L.Ed.2d 392 (1980) (quoting *United States v. Dickerson*, 310 U.S. 554, 555, 60 S.Ct. 1034, 1035, 84 L.Ed. 1356 (1940)). However, we do not find that Congress' statements in the 1993 appropriations legislation constitutes an implied amendment to the HPA. *See Tennessee Valley Authority v. Hill*, 437 U.S. 153, 189, 98 S.Ct. 2279, 2299, 57 L.Ed.2d 117 (1978). The 1993 appropriations legislation applied only to Fiscal Year 1993. Moreover, Congress was clearly aware of USDA's and APHIS's reliance on digital palpation as a means of finding "soreness" under the HPA. In its appropriations legislation Congress could have but did not direct the Secretary to discontinue the practice of finding "soreness" based on digital palpation alone. In addition, Congress could have but did not, amend the

HPA to prohibit a finding of "soreness" based on digital palpation alone.[2]

Furthermore, the March 22, 1994 guidelines cited by petitioners do not prohibit either the VMOs or USDA from basing a finding of "soreness" under the HPA solely on a horse's pain responses to digital palpation. Rather, the guidelines set forth the steps that a VMO should take in examining a horse. However, the guidelines are silent as to what is the basis for determining that the horse is "sore." Those criteria are set forth in the HPA and in the implementing regulations in 9 C.F.R. Part 11.

Therefore, contrary to petitioners' assertions, a finding of "soreness" based upon the results of digital palpation alone is sufficient to invoke the rebuttable presumption of 15 U.S.C. § 1825(d)(5).

## C.

Petitioners argue that the Secretary's decision is not supported by substantial evidence because in weighing the evidence, the ALJ chose to credit the testimony of the four VMOs, Drs. Clawson, Riggins, Dienhart, and Wood, over the contradictory testimony of other more qualified witnesses who testified that Ultimate Beam was not "sore" on May 26 and July 21, 1990. In effect, petitioners are asserting that the ALJ erred in finding that the evidence they presented was insufficient to overcome the rebuttable presumption of 15 U.S.C. § 1825(d)(5), which was invoked by the affidavits and testimony of Drs. Clawson, Riggins, Dienhart, and Wood.

■ First, the affidavits of the four VMOs are sufficient to invoke the presumption of 15 U.S.C. § 1825(d)(5) that Ultimate Beam was "sore" on May 26 and July 21, 1990. As noted above, Drs. Clawson and Riggins conducted independent examinations of Ultimate Beam on the night of May 26, 1990, after

DQP Thomas excused him from the show. In this case, the affidavits of Drs. Clawson and Riggins are sufficiently detailed as to constitute substantial evidence that Ultimate Beam was "sore" when the VMOs examined him on May 26, 1990. Dr. Clawson indicated that Ultimate Beam

> exhibited pain to the palpation of the anterior pastern of both front feet. The pain responses were more extreme on the right front pastern than the left. The horse also exhibited pain when palpated on the lateral posterior pastern.

J.A. 96. Dr. Riggins indicated that Ultimate Beam

> showed signs of pain by jerking its foot and tightening its abdominal muscles when the posterior and anterior pasterns were palpated on the left foot. I then examined the right foot. The horse would raise its head, jerk the foot and tighten the abdominal muscles showing signs of extreme pain when I applied pressure to [the anterior pastern of] the right foot.

J.A. 99–100.

Second, the affidavits of Drs. Dienhart and Wood are sufficiently detailed as to constitute substantial evidence that Ultimate Beam was "sore" when the VMOs examined him on July 21, 1990. Dr. Dienhart indicated that when he examined Ultimate Beam's left foot,

> [t]he horse exhibited strong and definite pain responses upon digital pressure above the bulb of the heel on the medial side. The horse attempted to withdraw his foot, jerked his head back and tightened abdominal musculature. I then palpated the anterior aspect of the left front pastern. Similar pain responses were observed upon palpation. . . . These responses were consistent and repeatable every time these areas were palpated.

---

**2.** Furthermore, a review of the Summary of Alleged Violation forms, J.A. 95, 102, shows that VMOs are required to do more than digital palpation when examining a horse. The forms call for an evaluation of factors such as "way of going," "general appearance, attitude and stance," "respiration," "perspiration," and "compliance with the 'scar rule.'" Drs. Clawson and Riggins indicated on the form which they filled out that Ultimate Beam's perspiration, respiration, general appearance, attitude, and

stance were "ok," that the horse "move[d] out good (sic)," and that the horse was in compliance with the scar rule. J.A. 95. On the form filled out by Drs. Dienhart and Wood, they indicated that Ultimate Beam's way of going was "normal—led freely on loose rein," and that the horse's general appearance, attitude and stance were "normal." J.A. 102. Thus, the examination by the VMOs in this case did consist of more than digital palpation.

I then examined the right pastern in the same manner. I got the same pain responses both posteriorly and anteriorly on the right foot as I did on the left foot. J.A. 103. Dr. Wood stated that Ultimate Beam

exhibited pain by trying to withdraw his foot from the stimulus. I determined the horse to be Bilaterally Sore. The areas involved . . . included the posterior pastern just above the medial bulb of the heel and ranging proximally and medially toward the medial pastern joint area, and on the anterior pastern an area ranging from medial to lateral beginning about 2 cm. above the coronary band and proceeding proximally for about 3 cm.

J.A. 104.

The statutory presumption that Ultimate Beam was "sore" as defined by the HPA, was not rebutted by the evidence presented by petitioners. Petitioners Bobo and Mitchell assert that the affidavits and VS Form 19–7 which were filled out by Drs. Clawson and Riggins following their examination of Ultimate Beam on May 26, 1990, and the affidavits and VS Form 19–7 which were filled out by Drs. Dienhart and Wood following their examination of the horse on July 21, 1990, are hearsay and, thus, an insufficient basis to find a violation of the HPA.

"Provided it is relevant and material, hearsay is admissible in administrative proceeding. . . ." *Hoska v. United States Dep't of the Army,* 677 F.2d 131, 138 (D.C.Cir.1982). "Moreover, under certain circumstances, hearsay can constitute substantial evidence." *Id.* (citing *Richardson v. Perales,* 402 U.S. 389, 402, 91 S.Ct. 1420, 1427, 28 L.Ed.2d 842 (1971)). "[H]earsay may be substantial evidence depending on its truthfulness, reasonableness and credibility; hearsay statements are highly probative where declarants are disinterested witnesses, statements are essentially consistent, and counsel had access to the statements prior to agency hearing." *Id.* at 138–39 (citing *Johnson v. United States,* 628 F.2d 187, 190–91 (D.C.Cir.1980)). Also, "hearsay may constitute substantial evidence depending upon its probative value and reliability, considering, *inter alia,* possible bias of the declarant, whether [the] state-

ments are signed and sworn to, whether they are contradicted by direct testimony, whether the declarant is available, and whether the hearsay is corroborated." *Id.* at 139 (citing *Calhoun v. Bailar,* 626 F.2d 145, 149 (9th Cir.1980), *cert. denied,* 452 U.S. 906, 101 S.Ct. 3033, 69 L.Ed.2d 407 (1981)).

In this case, although three of the four VMOs, Drs. Clawson, Riggins, and Wood, testified that they had no independent recollection of their examinations of Ultimate Beam, the affidavits and VS Forms 19–7 completed by the veterinarians were reliable recordings of their examinations of Ultimate Beam. All four of the VMOs testified that they signed the forms and completed the affidavits while their examination of Ultimate Beam was still fresh in their minds. Further, the affidavits contained details of each of the veterinarians' examinations, particularly descriptions of the method of palpation and the specific pain responses elicited from Ultimate Beam. In addition, since all four veterinarians testified at the administrative hearing, counsel for petitioners Bobo and Mitchell had the opportunity to cross-examine each of the veterinarians and to challenge the reliability of the opinions and factual findings contained in these documents. Accordingly, although the documentary evidence completed by the four veterinarians was "technically hearsay," it was properly admitted and relied on in this case. *See Gray,* 39 F.3d at 676. Thus, the documentary evidence is substantial evidence in support of the Secretary's finding that Ultimate Beam was "sore" on May 26 and July 21, 1990.

■ Contrary to petitioners' assertions, the evidence they presented was not sufficient to rebut the presumption invoked by the documentary evidence presented by the four VMOs. With regard to Drs. Clawson and Riggins examinations on May 26, 1990, petitioners have not overcome the presumption that Ultimate Beam was "sore" on that occasion. Although DQP Thomas, who examined and excused Ultimate Beam from the Shelbyville Fun Show on May 26, 1990, testified that he found Ultimate Beam "sensitive" in both front feet, this is not inconsistent with the findings of Drs. Clawson and Riggins.

Indeed, under § 1825(d)(5), a horse which manifests abnormal sensitivity in both of its forelimbs is presumed to be "sore" under the HPA. Moreover, although Mr. Rowland testified that on certain occasions he had seen Dr. Riggins twist the skin of a horse's foot when performing examinations and perform digital palpation using the end of his thumb, Rowland admitted that he could not say that he had seen Dr. Riggins do so during his examination of Ultimate Beam.

Moreover, although Drs. Baker and O'Brien examined Ultimate Beam sometime during the evening of May 26, 1990, and testified that he was not "sore" when they examined him, both the ALJ and JO properly discounted their testimony. First, a time was not established for Dr. O'Brien's examination of Ultimate Beam. The USDA has recognized that examinations occurring later are not accorded the same probative weight that is given to examinations performed immediately after a horse exits the show ring because of the possibility of anesthetizing the horse or altering the situation. *In re Thornton,* 41 Agric. Dec. 870, 1982 WL 37163 at *7 (1982). As one JO put it, "[i]f the horse was sored, the individuals responsible would have little or no hesitancy to try to conceal it." *Id.* In addition, both Drs. Baker and O'Brien expressed the opinion that a horse must exhibit an abnormal gait to be "sore" as defined by the HPA, an opinion which is contrary to the Act.

Finally, although petitioners Bobo and Mitchell both testified that Ultimate Beam's responses which were observed by Drs. Clawson and Riggins at the Shelbyville show were the result of Ultimate Beam's nervousness or high strung nature, both Drs. Clawson and Riggins testified that they use methods, such as coming back and repalpating a spot at which they obtained a response to palpation to see if the horse responds consistently, in order to distinguish a pain reaction from a reaction due to a horse that is nervous, high strung, or silly about its feet.

■ Moreover, with regard to the examinations of Drs. Dienhart and Wood on July 21, 1990, petitioners have not presented evidence sufficient to overcome the presumption that Ultimate Beam was sore on that occasion. Although Drs. Proctor and Johnson saw videotapes of Ultimate Beam's performance in the Albertville show ring and of petitioner Bobo's alleged digital palpation of Ultimate Beam, neither veterinarian actually examined Ultimate Beam on July 21, 1990. Further, although petitioner Bobo and Mr. Gleghorn testified that they saw Dr. Dienhart palpate Ultimate Beam using his thumbnail, rather than the ball of his thumb, the ALJ found that Dr. Dienhart's testimony was more credible due to certain inconsistencies between Mr. Bobo's testimony and Mr. Gleghorn's testimony.

Mr. Bobo testified that Dr. Dienhart failed to examine the posterior pastern on Ultimate Beam's right foot. However, Mr. Gleghorn testified that he saw Dr. Dienhart examine this area. Further, Dr. Dienhart testified that he properly palpated and examined Ultimate Beam.

■ The ALJ specifically found that the reliability of these witnesses' memories is questionable since . . . they contradicted each other. Mr. Bobo alleged that Dr. Dienhart entirely failed to examine the posterior pastern of the horse's right foot. By contrast, Mr. Gleghorn testified that he saw Dr. Dienhart examine this area. Because of this contradiction, I find more credible Dr. Dienhart's denial, on rebuttal, of the contention that he dug his thumbnail into the horse's pastern. Dr. Dienhart testified that he palpated the entire area of both pasterns and specifically recalled that he palpated the horse's right posterior pastern

\* \* \* \* \* \*

The testimonies of . . . Bobo and Mr. Gleghorn, which contradict each other, do not warrant the same weight as the consistent, concurring evidence of the USDA veterinarians [Dienhart and Wood]. Even . . . Bobo and Mr. Gleghorn, who questioned Dr. Dienhart's examination methods, admitted that Dr. Wood, who concurred with Dr. Dienhart's findings, performed a proper examination. However, Mr. Gleghorn's layman's opinion regarding the significance of the horse's reactions during Dr. Wood's examination does not outweigh the credible evidence presented by the USDA veterinarians.

J.A. 23–24 (citations omitted). This court generally will not disturb and gives deference to the credibility assessments of an ALJ who had the opportunity to observe the demeanor of the witnesses. *Tyra v. Secretary of Health & Human Servs.*, 896 F.2d 1024, 1030 (6th Cir.1990); *N.L.R.B. v. Magnetics, Int'l, Inc.*, 699 F.2d 806, 813 (6th Cir.1983). Accordingly, an ALJ's credibility findings are upheld "unless they are 'inherently incredible or patently unreasonable.'" *Photo–Sonics, Inc. v. N.L.R.B.*, 678 F.2d 121, 123 (9th Cir. 1982) (quoting *N.L.R.B. v. Anthony Co.*, 557 F.2d 692, 695 (9th Cir.1977)).

In this case, there is nothing inherently incredible or patently unreasonable about the ALJ's finding that the consistent testimony of Drs. Dienhart and Wood was more credible than the somewhat contradictory testimony of petitioner Bobo and Mr. Gleghorn. Therefore, we conclude that the decision of the Secretary that Ultimate Beam was "sore" within the meaning of the HPA on two occasions, namely, May 26 and July 21, 1990, is supported by substantial evidence.

### III.

For the reasons stated, the petition for review is DENIED.