NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 07a0125n.06
Filed: February 15, 2007

No. 05-4487

## UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

MIKE TURNER and SUSIE HARMON,
                Petitioners,

v.

UNITED STATES DEPARTMENT
OF AGRICULTURE,
                Respondent.

ON PETITION FOR REVIEW
OF AN ORDER OF THE
SECRETARY, UNITED STATES
DEPARTMENT OF AGRICULTURE

**OPINION**

_____/

**Before: BATCHELDER and MOORE, Circuit Judges; COHN [*], District Judge**

      **AVERN COHN**, **District Judge**: Petitioners Susie Harmon and Mike Turner seek review of the decision of the Secretary of Agriculture pursuant to the Horse Protection Act ("HPA"), 15 U.S.C. § 1821, *et seq*., that they entered a Tennessee Walking Horse, "The Ultra Doc", at a horse show while the horse was "sore." The issues on appeal are (1) whether substantial evidence supports the finding of the Judicial Officer that The Ultra Doc was sore within the meaning of the HPA, and (2) whether petitioner Harmon "entered" The Ultra Doc into the show under 15 U.S.C. § 1824(2)(B). For the reasons that follow, the petition for review will be denied.

_____

      [*] The Honorable Avern Cohn, United States District Judge for the Eastern District of Michigan, sitting by designation

1

# I.

## A. Statutory Framework

The HPA prohibits the "entering" of sore horses for, among other things, exhibition at horse shows. 15 U.S.C. § 1824(2).[1] A "sore" horse is a horse on which chemicals or other implements have been used on its front feet to make the horse highly sensitive to pain. 15 U.S.C. § 1821(3). When a horse's front feet are deliberately made sore "the intense pain which the animal suffer[s] when placing his forefeet on the ground would cause him to lift them up quickly and thrust them forward, reproducing exactly" the distinctive high-stepping gait that spectators and show judges look for in a champion Tennessee Walking Horse. H.R. Rep. No. 91-1597, 91st Cong. 2d Sess. 2 (1970), reprinted in 1970 U.S.C.C.A.N. 4870, 4871. "[A] horse shall be presumed to be a horse which is sore if it manifests abnormal sensitivity or inflammation in both of its forelimbs or both of its hindlimbs." 15 U.S.C. § 1825(d)(5). Before competing in a show, a horse is usually examined by Designated Qualified Persons (DQPs) and by two Veterinarian Medical Officers (VMOs) to determine whether the horse is "sore." DQPs are employed by the management of a horse show to inspect the horses for soreness and to prevent sore horses from competing. 15 U.S.C. § 1823(c). The DQPs work under the supervision of VMOs. 9 C.F.R. §§ 11.7, 11.21.

## B. Factual Background & Procedural History

Petitioner Harmon was the owner of The Ultra Doc and petitioner Turner was his trainer.

---

[1] 15 U.S.C. § 1824(2) proscribes the following: "The … entering for the purpose of showing or exhibiting in any horse show or horse exhibition, any horse which is sore."

On May 26, 2000, Turner entered The Ultra Doc in the 30th Annual Spring Fun Show Preview (Fun Show Preview), in Shelbyville, Tennessee. Turner paid the entrance fee for The Ultra Doc. He stated that he had Harmon's permission to enter the horse and that he expected Harmon to reimburse him for the fee. Harmon stated that she planned to ride The Ultra Doc in the show.

Prior to the commencement of the show, The Ultra Doc underwent examination by a DQP and two VMOs. DQP Charles Thomas (DQP Thomas) performed a pre-show inspection of The Ultra Doc under the National Horse Show Commission (NHSC) guidelines, which utilizes a point system. DQP Thomas found that The Ultra Doc exhibited mild pain responses when palpated. In particular, DQP Thomas documented on a NHSC Examination Form that The Ultra Doc "[r]eacted left foot outside, right foot [i]nside/ left foot lighter than right foot." He also noted that The Ultra Doc was "tossing [his] head for balance" and "flexing [his] abdominal muscles [and] [a]lso stepped forward when checking R[igh]t. Foot." Based on this evaluation DQP Thomas disqualified The Ultra Doc under the NHSC guidelines. However, the total points he assigned to The Ultra Doc did not rise to the level of an HPA violation. DQP Thomas documented his evaluation by completing a NHSC Examination Form, DQP Ticket[2], and by signing an affidavit.

Next, VMO John Guedron (VMO Guedron), and then VMO Clement Dussault (VMO Dussault), each examined The Ultra Doc separately. The two VMOs then discussed their findings and agreed that the Ultra Doc was "sore" under the HPA. VMO Guedron filled out a Summary of Alleged Violations Form ("Summary Form"), APHIS 7077. VMO Dussault signed

---

[2] The DQP Ticket requests statistical information such as the horse's name and sex, and the names and addresses of the horse's owner, trainer, and exhibitor.

the Summary Form to indicate that he agreed with its contents. The Summary Form includes a diagram of a horse's legs on which the VMO can mark where the subject horse is sore. On The Ultra Doc's Summary Form, VMO Guedron marked "X"s on the lateral side of the horse's lower left foot and on the medial side of the horse's right foot. He also explained that the " 'Xs' = Areas of consistent, repeatable pain responses." That night, VMO Dussault signed an affidavit relating to his evaluation, in which he concluded that in his "professional opinion this horse would feel pain while moving and this was caused by mechanical and/or chemical means."

On July 10, 2001, the Administrator, Animal and Plant Health Inspection Service (APHIS) issued a complaint charging petitioners with violating 15 U.S.C. § 1824(2)(B) by entering The Ultra Doc at the Fun Show Preview on May 26, 2000.[3] A hearing was held before an Administrative Law Judge (ALJ) on March 29, 2005. The following witnesses testified at the hearing: VMO Dussault, DQP Thomas, Lonnie Messic (the Executive Vice President of the NHSC), petitioner Harmon, and petitioner Turner. The Administrator also introduced documentary evidence including VMO Dussault's affidavit, the Summary Form, DQP Thomas' NHSC forms, and video tapes of the inspections performed by DQP Thomas, VMO Guedron, and VMO Dussault.

On June 2, 2005, the ALJ dismissed the claims against the petitioners with prejudice after concluding that the Administrator "failed to offer sufficient proof to support a violation of the Act." Specifically the ALJ found that VMO Dussault's testimony at the hearing was not reliable

---

[3] The Complaint also alleged that Harmon was the owner of the horse and had "allowed" the entry of a sore horse into a show in violation of Section 1824(2)(D). Because the ALJ dismissed the charges against petitioners, he did not rule on this issue. The Administrator appealed did not appeal this issue to the JO.

or probative. First, he noted that Dussault had no independent recollection of his examination of The Ultra Doc, which had occurred nearly five years before his testimony. Second, the ALJ found that VMO Dussault had merely signed his name to the Summary Form, and that VMO Guedron and another investigator who actually filled out the form did not testify. Third, the ALJ found that VMO Dussault failed to document or testify that his affidavit was created while the events were still fresh in his mind.

Fourth, the ALJ found that the documents upon which VMO Dussault relied, specifically the Summary Form and his affidavit, were "frought with sloppiness and inaccuracy." In particular, question 17 of the Summary Form requests the sex of the horse. The Ultra Doc is a stallion, however someone answered "G", indicating that The Ultra Doc is a gelding. Likewise, question 12 of the Summary Form requests the name of the owner of the horse. It is incorrectly answered "John Harmon" instead of "Susie Harmon."

Finally, the ALJ pointed out that VMO Dussault stated in his affidavit that The Ultra Doc's "responses to palpation were mild on the left foot and moderate to severe on the right foot." The ALJ ruled that a mild pain response does not demonstrate "abnormal sensitivity," triggering the presumption that The Ultra Doc was sore under section 1825(d)(5).

In reaching his decision in favor of petitioners, the ALJ relied on DQP Thomas' hearing testimony, which he found to be "forthright and credible, [and] his notes more detailed than those of the USDA veterinarians." The ALJ believed that in order to accept the opinion of VMO Dussault, he had to "totally discount the opinions and findings" of DQP Thomas, "whose memory of his examination was far superior to that of the VMO testifying at the trial."

5

The Administrator appealed the ALJ's decision to a Judicial Officer (JO). On October 26, 2005, the JO issued his Decision and Order finding that Turner and Harmon were in violation of 15 U.S.C. § 1824(2)(B). The JO imposed upon each petitioner a civil penalty of $2,200.00 and disqualified each from "showing, exhibiting, or entering any horse, and from managing, judging or otherwise participating in any horse show, horse exhibition, horse sale, or horse auction" for a period of one year.

In contrast to the ALJ, the JO found the Summary Form and VMO Dussault's affidavit to be reliable and probative. Although the JO accepted that VMO Dussault did not fill out the Summary Form, but only signed it, he found that the Summary Form "reflects the results of two independent pre-show physical examinations ... [and] tends to prove the allegation in the Complaint." In so finding, the JO relied upon VMO Dussault's testimony at the hearing where he explained that when two VMOs find reactions to palpation in the same place and agree that a horse is sore, the veterinarian who first examines the horse will fill out the Summary Form, and the second veterinarian who examined the horse will sign it.

Although the JO agreed with the ALJ that there were inaccuracies as to The Ultra Doc's sex and ownership on the Summary Form, he found that these errors were not significant with regard to the charges against the petitioners. In particular, he found that the issue of whether The Ultra Doc was sore did not depend on its sex; and he found that Harmon had admitted that she was the owner at all times material to the proceeding. Next, the JO found VMO Dussault's statement in his affidavit that The Ultra Doc's "responses to palpation were mild on the left foot and moderate to severe on the right foot" was a sufficient basis to demonstrate "abnormal sensitivity," triggering the presumption that the horse was sore under section 1825(d)(5). The JO

6

stated that the standard for finding soreness is "abnormal sensitivity in both of [a horse's] forelimbs or hindlimbs," and that this is established where a horse experiences "bilateral reproducible pain responses to palpation" as VMOs Guedron and Dussault believed The Ultra Doc had experienced.

Finally, the JO disagreed with the ALJ's opinion that in order to accept VMO Dussault's affidavit statement and hearing testimony, one would have to totally disregard DQP Thomas' evaluation. The JO found that DQP Thomas' findings were consistent with VMO Dussault's. The JO pointed out that DQP Thomas stated on the NHSC Examination Form that The Ultra Doc "[r]eacted left foot outside, right foot [i]nside/ left foot lighter than right foot." The JO found this statement to be consistent with VMO Dussault's statement that the Ultra Doc's "responses to palpation were "mild on the left foot and moderate to severe on the right."

## C.

Turner and Harmon filed a timely petition for review with this Court on November 28, 2005.

## II.

### A. Standard of Review

We review an administrative decision of the United Stated Department of Agriculture (USDA) under the HPA to determine "whether the proper legal standards were employed and substantial evidence supports the decision." *Fleming v. United States Dep't of Agric.*, 713 F.2d 179, 188 (6th Cir. 1983). Substantial evidence means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938). As we have previously explained:

7

> Substantial evidence is more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. Substantiality of the evidence must be based upon the record taken as a whole. Substantial evidence is not simply some evidence, or even a great deal of evidence. Rather, the substantiality of evidence must take into account whatever in the record fairly detracts from its weight.

*Murphy v. Sec'y of Health & Human Serv.*, 801 F.2d 182, 184 (6th Cir. 1986) (internal citations and quotations omitted). When a JO disagrees with a ALJ's conclusion and substitutes his judgment for that of the ALJ, this Court still utilizes the substantial evidence test to review the JO's decision. *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 496 (1951). "[T]he ALJ's finding are simply part of the record to be weighed against other evidence supporting the agency." *Stamper v. Sec'y of Agric.*, 722 F.2d 1483, 1486 (9th Cir. 1984). Moreover, deference should be given to an agency's reasonable decision: "Even if we were to reach a different conclusion from the agency, the agency's reasonable choice, supported by substantial evidence, may not be overturned." *Elliot v. Adm'r, Animal & Plant Health Insp. Serv.*, 990 F.2d 140, 143-4 (4th Cir. 1993).

### B. Whether there was Substantial Evidence for the Judicial Officer to Conclude that The Ultra Doc was "Sore"

### 1.

Petitioners argue that the ALJ's decision was correct, and that the record as a whole cannot support the JO's decision that they violated 15 U.S.C. § 1824(2)(B). Petitioners compare the facts here to those in *Bobo v. United States Dep't. of Agric.*, 52 F.3d 1406 (6th Cir. 1995). In *Bobo*, we found that the ALJ had substantial evidence to conclude that the petitioner's horse was "sore" based on documentary evidence, and the testimony of the VMO's who inspected the horse. 52 F.3d at 413-15. Petitioners argue that the evidence here falls far short of the evidence

presented in *Bobo*. Petitioners first point out that in *Bobo*, all of the VMOs who inspected the horse were present to testify and subject to cross-examination at the hearing; and while three of the four VMOs stated that they did not have independent recollections of their inspections, all of the VMO's testified that they had signed the evaluation forms and created their affidavits while inspection was still fresh in their minds.[4] Petitioners argue that while VMO Dussault testified that he did not have an independent recollection of the inspection, he failed to state that his affidavit was created while the inspection was still fresh in his mind. Furthermore, petitioners point out that VMO Guedron did not testify or present an affidavit on his behalf.

Next, petitioners assert that in *Bobo* each VMO included in his affidavit a description of the method of palpation and the specific pain responses elicited from the horse. 52 F.3d at 413-15. Petitioners argue that here, VMO Dussault failed to denote a specific finding of The Ultra Doc's pain responses in his affidavit. Additionally, petitioners argue that VMO Dussault did not properly document a complete examination of The Ultra Doc because he failed to note whether he performed an evaluation of The Ultra Doc's appearance as required by the 2000 training manual published by the USDA for the training of DQPs and VMOs.

Finally, petitioners point out several mistakes on the Summary Form in addition to those that the ALJ discussed. For instance, while it is undisputed that DQP Thomas examined The Ultra Doc first, the Summary Form states that VMOs Guedron and Dussault inspected The Ultra Doc before DQP Thomas. Furthermore, question 27, which requests the "Name and address of person(s) responsible for transportation" was left unanswered. Likewise, question 28, which asks

---

[4] In *Bobo,* the Administrator charged petitioner with entering a horse on two separate occasions. At each show the horse was examined by two VMOs.

for the "Name and Address of Person(s) that entered horse" was also left unanswered. Finally, question 29 asks "Is the horse sore?" and requires the inspector to check either "yes" or "no", and further requests that the VMO "explain" his findings if he checks "yes." Although VMO Guedron checked "yes" for this question, he did not offer an explanation in the designated space.

**2**.

None of the petitioners' arguments are availing. There was substantial evidence in the record upon which the JO could conclude that The Ultra Doc was sore. First, this Court has previously held that the affidavits of VMOs and Summary of Alleged Violations Forms are reliable and probative. *Gray v. United States Dep't. of Agric.*, 39 F.3d 670, 676 (6th Cir. 1994). This is so even where a VMO has no independent recollection of the inspection. *Id*. at 676 n.5; *see also Bobo*, 52 F.3d at 1413. In *Gray* we explained that although affidavits and evaluation forms are technically hearsay, they are admissible if they are probative, and their use is fundamentally fair. 39 F.3d at 676. In *Gray* we held that the affidavits of the VMOs and a Summary of Alleged Violations Form satisfied the admissibility criteria even where the VMOs in that case had no independent recollection because "[t]hey were signed and/or prepared by individuals who were experienced in their tasks and who had no reasons to record their findings in other than an impartial fashion. Moreover, the documents were created almost contemporaneously with the observations they relay." *Id*.

We find that VMO Dussault's affidavit meets this criteria. VMO Dussault is an experienced veterinarian; there is no evidence that he did not conduct his inspection of The Ultra Doc in an impartial fashion; and he created his affidavit the same night as the inspection. Likewise, we find that the Summary of Alleged Violations also meets this criteria. The

10

Summary Form was filled out by VMO Guedron after VMOs Guedron and Dussault independently inspected The Ultra Doc and agreed that the horse was sore and was signed by VMO Dussault. Again, there is no evidence that either VMOs inspection was not conducted in an impartial fashion, and the Summary Form was filled out shortly after both inspections occurred.

The JO explained why he believed the inaccuracies as to The Ultra Doc's sex and ownership were irrelevant to the question of whether The Ultra Doc was sore. We similarly find that the incomplete answers highlighted by the petitioners in question 27, which requests the name of the person(s) who transported the horse to the show, and question 28, which requests the name and address of the person(s) who entered the horse into the show, are also irrelevant to the issue of whether the Ultra Doc was sore. Moreover, these answers have been provided for elsewhere in the record. As to question 29, which asks if the horse is sore, and if the inspector answers "yes," requests an explanation, VMO Guedron provided an explanation by marking "X"s on the diagram of the horse's legs where he and VMO Dussault found "[a]reas of consistent, repeatable pain responses."

Next, we find that VMO Dussault's affidavit is sufficiently detailed as to constitute substantial evidence that The Ultra Doc was sore on May 26, 2000. Contrary to petitioner's assertion, VMO Dussault does describe the methods of palpation he used during his inspection, and he also notes The Ultra Doc's specific response to each palpation. In particular, he states in his affidavit that:

> I approached the horse on the left side making contact with the horse and the
> horse presented its foot. I examined the posterior aspect and then moved the leg
> forward. When I palpated the anterior and lateral aspect as noted on the APHIS

11

Form 7077, of the left front pastern, the horse withdrew its foot. I then placed the foot on the ground. I went to the right side of the horse and made contact with the horse and the horse presented its foot for inspection. I examined the posterior aspect of the right foot and moved the foot forward. When I palpated the area as noted on the [Summary of Alleged Violations Form], the anterior and medial aspects of the right foot the horse withdrew its foot. The responses to palpation were mild on the left foot and moderate to severe on the right.

Moreover, we find that VMO Dussault did evaluate the physical appearance of the Ultra Doc. He states in his affidavit that just before he performed the palpation, he "observed the horse move around the cone and noted it moved tightly."

Finally, we find that the JO reasonably concluded that DQP Thomas' findings are consistent with those of VMO Guedron and VMO Dussault. All three examiners noted that The Ultra Doc reacted to palpation on both the left and right forelegs in approximately the same area, and that this reaction could be interpreted to mean that the horse was experiencing pain. DQP Thomas noted that on the Ultra Doc's physical examination, the horse "[r]eacted left foot outside, right foot [i]nside/ left foot lighter than right foot." He further noted, "[a]ppearance, some tossing of head, flexing of abdominal mussel [sic]. Horse stepped forward in rear when checking right foot." When DQP Thomas was asked at the hearing what does it mean "when a horse tosses its head during an examination?," he responded that The Ultra Doc "could be having a certain spot that he could have some pain, mild pain or whatever, and he might want to shift his leg or move over his head or whatever." This is similar to the diagram on the Summary Form, on which VMO Guedron marked "X"s on The Ultra Doc's lower left and right legs to indicate where the horse appeared to experience "areas of consistent, repeatable pain responses." VMO Dussault concurred with these findings and signed the form. VMO Dussault similarly concluded in his affidavit that, "[t]he responses to palpation were mild on the left foot and moderate to

12

severe on the right … In my professional opinion this horse would feel pain while moving and this was caused by mechanical and/or chemical means."

Altogether, this evidence supports the JO's conclusion that The Ultra Doc exhibited abnormal sensitivity, triggering the statutory presumption of soreness. The JO correctly stated that the standard for finding soreness is "abnormal sensitivity in both of a [horse's] forelimbs or hindlimbs." This is established where the horse experiences "bilateral reproducible pain responses to palpation." *See, e.g., In re Eddie C. Tuck*, 53 Agric. Dec. 261, 294-95 (1994); *In re William Earl Bobo*, 53 Agric. Dec. 176, 204 (1994); *In re Billy Gray,* 52 Agric. Dec. 1044, 1077 (1993); *In re Lloyd R. Smith*, 51 Agric. Dec. 327, 330-31 (1992). The severity of The Ultra Doc's pain responses is not an issue. All three examiners noted that The Ultra Doc reacted to their palpation in a manner that could reasonably be interpreted to be pain responses in both limbs. Neither Turner nor Harmon have attempted to rebut this presumption nor have they presented case law that states that a "mild" response in one limb is insufficient to trigger a presumption of soreness.

We find that the JO conducted a careful and thorough review of the record, and provided an adequate explanation for why he reached a different conclusion than the ALJ, citing to probative and reliable evidence. Therefore, this Court finds that the JO did have substantial evidence on which to base his decision.

### C. Whether Susie Harmon "Entered" The Ultra Doc Under 15 U.S.C. § 1824(2)(B)

An individual violates the HPA by "entering for the purpose of showing ... in any horse show ... any horse which is sore." 15 U.S.C. § 1824(2)(B). The JO determined in his Findings of Facts that:

13

On or about May 26, 2000, Respondent Susie Harmon entered the Ultra Doc as entry number 185 in class number 21 at the 30th Annual Spring Fun Show Preview in Shelbyville, Tennessee, for the purpose of showing or exhibiting The Ultra Doc, by participating in the decision to enter The Ultra Doc in the 30th Annual Spring Fun Show Preview and scheduling herself to ride The Ultra Doc in the 30th Annual Spring Fun Show Preview.

The JO also held in his Conclusions of Law that:

On or about May 26, 2000, Respondent Susie Harmon entered the Ultra Doc as entry number 185 in class number 21 at the 30th Annual Spring Fun Show Preview in Shelbyville, Tennessee, for the purpose of showing or exhibiting The Ultra Doc, while the horse was sore, in violation of section 5(2)(B) of the Horse Protection Act (15 U.S.C. § 1824 (2)(B)).

Petitioner Harmon argues that although she owned The Ultra Doc on May 26, 2000, she did not enter him into the Fun Show Preview.

We find that Petitioner Harmon has forfeited any challenge to the JO's construction of 15 U.S.C. § 1824 (2)(B). In their opening brief, the petitioners do not argue that the JO's factual findings do not support the conclusion that Harmon entered The Ultra Doc in the show. Instead, they merely state in passing that Harmon "did not enter said horse in the 30th Annual Spring Fun Show on said date." They do not further develop this argument, or even argue that the JO lacked substantial evidence to support this conclusion. Further, the petitioners did not file a reply brief disputing the USDA's contention that substantial evidence supports the JO's findings. Because the petitioners referred to this issue in only the most perfunctory manner, they forfeited the argument. *See United States v. Reed*, 167 F. 3d 984, 993 (6th Cir.1999), *cert. denied*, 528 U.S. 897 (1999).

### III.

For the foregoing reasons, the petition for review is DENIED, and the order of the

14

Judicial Officer is AFFIRMED.